Charles D. Schmerler  (CS0953)
Mark A. Robertson (MR8906)
Joann Kahn (JK8671)
FULBRIGHT & JAWORSKI L.L.P.
666 Fifth Avenue
New York, NY  10103
(212) 318-3000
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

GVEC RESOURCE, INC. and PRIVATE EQUITY : 
MANAGEMENT GROUP, INC.,                           :
                                                                          :
                                   Plaintiffs,            :      06 Civ. 5199
                                                                          :
                 - against -                                 :
                                                                          :      **DECLARATION OF**
STRATEGY INTERNATIONAL INSURANCE GROUP, :      **CHARLES D. SCHMERLER**
INC., STRATEGY INVESTMENTS, LLC,        :
STRATEGY RESORT FINANCING, INC.,        :
JOHN HAMILTON and MICHAEL KELLY,        :
                                                                          :
                                   Defendants.         :
                                                                          :
------------------------------------------------------------------x

     CHARLES D. SCHMERLER, a member of the Bar of the State of New York, hereby

declares as follows pursuant to penalty of perjury:

     1.    I am a member of the firm of Fulbright & Jaworski, L.L.P., attorneys for plaintiffs

Private Equity Management Group ("PEMG") and GVEC Resource, Inc. ("GVECR").  I submit

this Declaration in support of plaintiffs' application for a temporary restraining order and

preliminary injunction restraining defendants Strategy International Insurance Group ("SIIG"),

Strategy Investments LLC ("SILLC") and Strategy Resort Financing, Inc. (Ontario)("SRFI")

from transferring or impairing: (i) the 100% membership interest in SILLC held by its parent,



SIIG, or (ii) the equity interest held by SILLC in the time share real estate development project at issue in this action.

2.      This action arises from SILLC's breach of a Loan Agreement, made and entered into as of June 26, 2006 by and between GVECR and SILLC (the "Loan Agreement"). SIIG and SRFI are parties to the Loan Agreement as guarantors. As discussed below, SILLC and SIIG also are in breach of a number of the loan documents executed in connection with the Loan Agreement, including the underlying Promissory Note, a Management Agreement, a Management Pledge Agreement and an Interim Pledge Agreement.

3.      The obligations of SILLC and the guarantors under the loan documents were to have been secured by second mortgages and notes in a time share real estate project being developed by Shell Vacations, LLC ("Shell"), one of the country's largest developers of such projects (the "Shell Project"). The project is comprised of three developments, one each in Napa, California, Waikiki, Hawaii and British Columbia, Canada. Additional security was pledged in the form of an insurance policy or surety bond to be posted by SILLC in the amount of $31,900,000.00. That bond or policy was to be reinsured with a company rated "A" or better. SILLC was required to provide an opinion letter from the law firm of Baker & McKenzie in a form acceptable to GVECR stating that the bond or policy was reinsured with a company rated "A" or better. In addition, SIIG was obligated to deliver to GVECR and PEMG its 100% membership interest in its subsidiary, SILLC (the "Member Interest"), as collateral for SILLC's obligation to deliver the insurance policy or bond. It is my understanding that pursuant to written agreement with Shell, SILLC is entitled to receive 45% of the cash flow from the Shell Project after payment of certain fees and expenses (the "Equity Interest"). Accordingly, control of the Member Interest in SILLC should provide plaintiff with that Equity Interest as collateral.

SIIG and SILLC have defaulted on these obligations. As a consequence, plaintiffs are without the security to which they are entitled, and face the risk of substantial loss in connection with the loan transaction.

4.  By this motion, plaintiffs seek a temporary restraining order and preliminary injunction prohibiting defendants from interfering with plaintiffs' rights in the collateral. Specifically, plaintiffs have come to understand that SILLC and SIIG may be seeking to impair plaintiffs' rights in the Member Interest by pledging all or part of it to a third party. Accordingly, we seek interim relief in the form of an Order restraining defendants from taking any steps to facilitate the transfer of the Member Interest, and directing them to comply with their obligations under the loan documents with respect to the collateral.

5.  The interim relief sought on this motion derives entirely from the contractual rights of PEMG and GVECR under the several loan documents. It is designed to ensure that the Member Interest is not and will not be impaired pending disposition of plaintiffs' claims. As I discuss below, the loan documents on their face establish that an Event of Default has occurred and that GVECR and PEMG are entitled to the interim relief requested.

6.  The facts underlying plaintiffs' claims in this lawsuit and describing the immediate and irreparable harm now confronted by them are set forth in detail in the accompanying Declaration of Todd Gillespie, executed July 7, 2006 (the "Gillespie Decl.")[1]. As Mr. Gillespie explains, defendant SIIG has pledged to deliver as collateral the Member Interest upon the occurrence of an Event of Default under certain of the loan documents, but now has refused to comply with its obligation. In addition, SILLC has failed to post the required bond

---

[1] Mr. Gillespie is not a lawyer. Accordingly, I submit this Declaration to set forth the provisions of each of the relevant loan documents which support plaintiffs' request for relief and to provide to the Court details of the discussions and correspondence between this office and Strategy and its counsel.

and reinsurance.  An Event of Default therefore has occurred, and GVECR and PEMG believe that defendants cannot possibly make payment under the loan agreement or of any award of damages in this lawsuit if the collateral is not preserved.  The preservation of plaintiffs' security is essential, and absent the relief requested, plaintiffs are exposed to losses in excess of $30 million.  See Gillespie Decl., ¶5.

7.    As Mr. Gillespie states, GVECR entered into a Loan Agreement with defendant SILLC whereunder GVECR was to loan approximately $29 million in connection with the financing of the Shell Project.  SILLC held second notes and second mortgages on the three properties, which in turn were collaterally assigned to GVECR as security for repayment of the loan amount.  See Gillespie Decl., ¶26 and Ex. 8.

8.    The first mortgages and first notes on the properties are held by affiliates of SILLC -- in the case of the Napa and Waikiki properties, by Strategy Resort Financing, Inc. (Florida)("Strategy Resort"), and in the case of the British Columbia property, by Hamsor, Inc.

9.    In the case of each of these positions, the Strategy lender apparently lacked the funds to loan to the project.  Accordingly, Strategy on the first position borrowed approximately $56 million from Veritas High Yield Arbitrage Funds LLC and certain of its affiliates ("Veritas").  SILLC on the second position borrowed from GVECR.

10.    Veritas now has taken the position that Strategy has failed to comply with its repayment obligations, and that it has diverted up to $11 million in cash flow from the development which properly was payable to Veritas.  Gillespie Decl., ¶74.  Strategy has been unable to meet its funding obligations to Shell, and Veritas therefore has refused to fund additional draws of funds to which Shell asserts it is entitled pursuant to its agreement with the Strategy lender.

4

11.     In addition, Shell has indicated that it requires certain concessions from the Strategy lenders, Veritas and GVECR in order to obtain regulatory approvals from the State of California in connection with the Napa project.  The parties have been unable to resolve that issue.  Gillespie Decl., ¶73.

12.     In early June, Shell filed a lawsuit in the United States District Court for the Northern District of California.  See Gillespie Decl.,¶77 and Ex. 22.  The complaint alleges that the Strategy lender wrongfully assigned the first notes and first mortgages to Veritas without obtaining prior written consent from Shell, and that the Strategy companies made numerous fraudulent misrepresentations regarding their financial condition in order to induce Shell to enter into the loan agreements.  Shell also asserts that each of the defendants has acted in bad faith by refusing to cooperate with Shell's efforts to obtain regulatory approval, and that Strategy and Veritas have wrongfully failed to fund the draw requests made by Shell.

13.     We since have learned that several of the Strategy companies and their executives, including defendant John Hamilton, have been sued in an action brought in this Court in February 2006 for fraudulent misrepresentation in connection with the sale of certain securities in a real estate transaction in Canada.  The suit seeks $50 million in damages.  Gillespie Decl., ¶61 and Ex. 17.

**The Loan Documents**

14.     In connection with the Shell project, plaintiffs and the Strategy defendants are party to the following agreements which support the relief requested.

        a.      Loan Agreement, made and entered into as of January 26, 2006, by and between GVECR and SILLC (the "Loan Agreement").  The Loan Agreement is executed

by defendants SIIG and SRFI as guarantors.  A copy of the Loan Agreement is attached as Gillespie Decl., Ex. 8.

      b.      Promissory Note, dated January 26, 2006. made by SILLC in favor of GVECR (the "Note").  The Note is executed by SIIG and SRFI as guarantors.  A copy of the Note is attached as Gillespie Decl., Ex. 9.

      c.      Management Agreement, made as of January 26, 2006, by and between SILLC and PEMG (the "Management Agreement").  SIIG is a signatory as guarantors.  A copy of the Management Agreement is attached as Gillespie Decl., Ex. 13.

      d.      Management Pledge Agreement, dated as of January 26, 2006, by and between SIIG and PEMG (the "Management Pledge Agreement").  A copy of the Management Pledge Agreement is attached as Gillespie Decl., Ex. 14.

      e.      Interim Pledge Agreement, dated as of January 26, 2006, by and among GVECR, SILLC and SIIG (the "Interim Pledge Agreement").  A copy of the Interim Pledge Agreement is attached as Gillespie Decl., Ex. 15.

### Defendants' Breaches Of Each of the Loan Documents

15.      The Interim Pledge Agreement provides specifically that SILLC shall obtain the guaranty or insurance policy reinsured by a carrier rated "A" or better on or before May 31, 2006.  Ex. 15 at ¶2.  The bond and reinsurance have not been provided.

16.      The Interim Pledge Agreement provides further that SIIG shall deliver the certificates representing the Member Interest simultaneously with execution of the agreement. Ex 15 at ¶2.  Despite repeated requests, the Member Interest has not been delivered.

17.      Both SILLC and SIIG have breached these obligations, and therefore are in default under the Interim Pledge Agreement.

18.     The Management Fee Pledge Agreement similarly provides that SIIG shall deliver the Member Interest simultaneous with execution. Ex. 14 ¶2. SIIG therefore is in breach of the Management Fee Pledge Agreement as well.

19.     The defaults of SILLC and SIIG under the Interim Pledge Agreement and Management Fee Pledge Agreement in turn trigger the cross-default provisions of the related loan documents. Specifically, the Note defines an Event of Default as, among other things, "default under any of the Loan Documents." Ex. 9 at ¶4(a)(ii). The Note defines "Loan Documents" to include "all other documents evidencing or securing the Loan or executed in connection with the Loan." Ex. 9 at p.1. Accordingly, the Interim Pledge Agreement and Management Fee Pledge Agreement are "Loan Documents," and a default under either is an Event of Default under the Note.

20.     SIIG and SILLC also are in default under the Loan Agreement. The delivery of the bond or insurance policy, with proper reinsurance, is a condition of closing on the loan. Although GVECR agreed to close without those documents, and entered into the Interim Pledge Agreement in order to extend to May 31, 2006 the deadline for tender thereof, the deadline now has passed. GVECR has not waived the right to obtain its collateral, and notice of default has been given. See Gillespie Decl., Ex. 21. In addition, a default under the Note, the Management Agreement, the Interim Pledge Agreement or the Management Pledge Agreement, each of which are defined as Loan Documents in the Loan Agreement (see Ex. 8 at ¶7.1(a)(iii)), constitutes an Event of Default under the Loan Agreement. These cross-defaults have been triggered by the failure to deliver the bond and reinsurance or the Member Interest.

21.     Finally, the Management Agreement provides that an Event of Default shall include a default by SILLC or any guarantor under the Note.  Ex. 13 at ¶5(a)(vii).  Accordingly, SILLC is in default under the Management Agreement.

**Plaintiffs' Efforts to Obtain Compliance**

22.     As Mr. Gillespie avers in the accompanying Declaration, GVECR twice communicated by letter to the Strategy companies during May 2006 seeking compliance with the obligations of SIIG and SILLC.  See Gillespie Decl., Exs. 18 and 19.  By letter dated May 24, 2006, Strategy replied that GVECR itself was in violation of the Loan Agreement, and that all of the loan documents therefore were void.  See Gillespie Decl., Ex. 20.

23.     On June 6, 2006, I attended a meeting at the offices of PEMG in Irvine, California.  The Strategy parties were represented by Louis Lettieri, the Chief Financial Officer, and Martin Weisberg of Baker & McKenzie, who indicated that he was outside counsel.  Also attending was defendant Michael Kelly of Builders & Contractors, Ltd., who was responsible for procuring the reinsurance.  Several of the executives and directors of GVECR and PEMG attended.

24.     At that meeting, GVECR and PEMG demanded that SILLC and SIIG provide the bond and opinion letter from Baker & McKenzie in forms acceptable to GVECR.  Both Mr. Lettieri and Mr. Kelly assured us that the bond and reinsurance would be forthcoming within days.  It was agreed that Mr. Weisberg would receive all of the relevant documents, and that he would contact me directly in order to make them available for review.  Mr. Weisberg made no specific commitment with respect to the content of the opinion letter from Baker & McKenzie.

25.     Mr. Weisberg telephoned me on Friday, June 9.  He stated that he had not received any documents from Mr. Kelly regarding the bond and reinsurance, but that he

anticipated that he would have them by the middle of the following week, and that he would email them to me for review. Mr. Weisberg stated further that he was attempting to contact the law firm of Baker & Hostetler, which he represented had drafted the Member Interest, in order to inquire as to delivery to GVECR pursuant to the loan documents..

26.     We did not receive documents from Mr. Weisberg over the next several days. On June 14, however, I was advised that Mr. Kelly had sent a draft of a Baker & McKenzie opinion letter to GVECR. Accordingly, I sent an email to Mr. Weisberg on June 15 requesting that the bond and related documents be emailed to me, as we had agreed. A copy of the email is attached as Ex. 26. On June 16 Mr. Weisberg replied by email that he had not received any documents from Mr. Kelly, and that he would contact him and get back to me. A copy of the email is attached as Ex 27.

27.     I did not hear further from Mr. Weisberg.

28.     On June 19, I sent an email to Mr. Weisberg requesting that he advise as to the status of delivery of the Member Interest. A copy of the email is attached as Ex. 28. I received no reply.

29.     On June 21, I sent a further email to Mr. Weisberg requesting a prompt response to the issues raised by GVECR and PEMG. A copy of the email is attached as Ex. 29. Mr. Weisberg replied by email that same day, advising that he had passed my email along to Mr. Lettieri, the Strategy CFO, and stating that "there are many outstanding issues between Strategy and you [sic] clients and various that need to be resolved to the mutual satisfaction of all parties." A copy of the email is attached as Ex. 30.

30.     I called Mr. Weisberg on July 5, and received a return call on July 7. At the outset of the call, I asked Mr. Weisberg to advise me as to the status of Strategy's delivery of the

bond and reinsurance, as well as the Member Interest. Mr. Weisberg stated that he understood that Michael Kelly had delivered documents regarding the bond and reinsurance to GVEC. I responded that I had seen the documents, and that they did not properly set forth that the appropriate reinsurance was in place. I told Mr. Weisberg that the same issues existed with the documentation as had existed for months, and that GVEC had become increasingly frustrated with Mr. Kelly. I also told him that SIIG, SILLC and Kelly had taken the position that the insurance documents could not be obtained or delivered until GVECR paid the premium of some $2 million. I stated that in my view, the Escrow Agreement entered into by the parties stated clearly that the obligation to advance the premium was that of defendants Kelly and Hamilton. Mr. Weisberg did not disagree. See Gillespie Decl., ¶56 and Ex. 16. Mr. Weisberg asked that I forward him a short memo addressing the documents, and that he would speak with Mr. Kelly.

31.    As to the Member Interest, Mr. Weisberg stated that he understood that Strategy, Veritas and Shell had been in active discussions in order to make a proposal to GVECR to resolve numerous issues which had arisen. He indicated that he believed that the proposal would include a transfer of certain parts of the equity interest held by SILLC to GVECR. I told Mr. Weisberg that it was the position of GVECR and PEMG that the Member Interests were to be delivered to them immediately. Mr. Weisberg replied that he had not been authorized by SIIG and SILLC to obtain or deliver the Member Interests, and that it was his understanding that SIIG and SILLC continued to maintain that they did not have an obligation to deliver the Member Interest.

32.    In addition, Mr. Weisberg stated that he believed that he would not continue to represent the Strategy companies because they were unable to pay the fees of his law firm.

33.     It was my clear impression from the discussion with Mr. Weisberg that SIIG and SILLC were in discussions with Veritas and/or Shell regarding a pledge or transfer of the Member Interest.

**The Interim Relief Requested By GVECR and PEMG**

34.     By this application, plaintiffs request an injunction restraining defendants from transferring or in any way impairing the Membership Interest, or from transferring or impairing the equity position held by SILLC in the Shell time share project.  This relief is derived from and entirely consistent with the provision of the loan documents.

35.     As Mr. Gillespie establishes by his Declaration and the exhibits submitted therewith, SILLC is contractually obligated under the Loan Agreement and the Interim Pledge Agreement to procure and deliver a bond or insurance policy in the amount of $31,900,000.00, reinsured by a company rated "A" or better.  Gillespie Decl. at ¶27, Exs. 8; ¶48, Exs.15.  In addition, both the Interim Pledge Agreement and the Management Fee Pledge Agreement require that SIIG deliver to GVECR and PEMG the Member Interest.  Gillespie Decl. at Exs. 15 and 14. Those agreements further provide that SIIG and SILLC shall take no steps whatsoever which in the reasonable judgment of GVECR or PEMG would impair the Member Interest or violate the provisions of any of the loan documents.  Ex. 15 at ¶52; Ex. 14 at ¶46.

36.     Significantly, the agreements do not require the occurrence of an Event of Default as a condition of delivery of the Member Interest.  Rather, preservation and delivery of their collateral is a contractual right of GVECR and PEMG upon execution of the agreements. Accordingly, by this application, GVECR and PEMG seek only enforcement of those rights for which they bargained and to which they already are entitled by contract.  Preservation of the

collateral services here to maintain the <u>status quo</u> among the parties and to protect the legitimate rights and expectations of plaintiffs.

## The Balance of Hardships Tips Decidedly In Favor of Plaintiffs

37.     Entry of the temporary restraining order and preliminary injunction requested by plaintiffs will result in no recognizable injury to defendants SILLC, SRFI or SIIG.

38.     Both SILLC and SIIG are contractually bound to deliver the Member Interest to GVECR and PEMG.  Moreover, plaintiffs have the contractual right to transfer the Member Interest into their own name upon the occurrence of an Event of Default, and SIIG and SILLC are bound to cooperate in effecting such transfer.  Gillespie Decl., Ex. 15 at ¶3; Ex. 14 at ¶4(a)

39.     Transfer of the Member Interest enables GVECR and/or PEMG to hold the Equity Interest of SILLC in the Shell Project – the very security bargained for and agreed by the parties. Consequently, the relief which we request enjoining any transfer or impairment of the Equity Interest also is entirely consistent with the loan documents.

40.     Because the loan agreements provide for the very relief we request, there can be no harm to defendants.  By contrast, if the relief is not granted, GVECR and PEMG may be left without collateral for some $30 million in losses, an amount plaintiffs believe defendants in no way are able to pay.  The balance of hardships therefore decidedly in favor of plaintiffs.

## Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief

41.     In the absence of an injunction issued by the Court, GVECR and PEMG will suffer immediate and irreparable harm.

42.     Although GVECR and PEMG have made the relevant UCC filings to protect their security, plaintiffs do not have possession of the member certificates.  Accordingly, two issues

arise.  First, if the Member Interests are not securities, SIIG may seek to pledge them to a third party.  As Mr. Gillespie states, plaintiffs are advised that SIIG may be negotiating to do just that.  Gillespie Decl. , ¶98.  If the Member Interests are securities, then SIIG may seek to deliver them to a third party.  In that event, although a clear violation of the Interim Pledge Agreement and Management Pledge Agreement would have occurred, plaintiffs would be without the bargained for collateral, and potentially unsecured on the loan and Management Fee.  Accordingly, we request that the Court direct the immediate delivery of the certificates into court pending disposition of this motion.

43.     As we set forth in the accompanying Memorandum Of Law in support of this application, the case law recognizes that dissipation of collateral constitutes irreparable harm which warrants injunctive relief.  In addition, the case law also recognizes that irreparable harm may result from the inability of defendant to pay monetary damages.  Memorandum of Law at

_____.

44.     Here, plaintiffs seek relief to preserve their collateral, which they have reason to believe is at risk.  Moreover, there are strong grounds to believe that defendants have no ability to repay the loan or to satisfy a judgment for money damages.  Injunctive relief therefore is warranted.

**Plaintiffs Should Not Be Required To Post An Undertaking**

45.     As I have stated, the interim relief which plaintiffs seek derive directly from the contract documents.  These are rights for which plaintiffs have bargained, and for which they have paid consideration of millions of dollars.

46.     At the same time, defendants can suffer no recognizable monetary damage as a consequence of a restraint against their breaching the clear and unambiguous obligation to which

the loan documents bind them.  They have no right whatsoever to impair the collateral promised to plaintiffs.

47.    Accordingly, because defendants can suffer no loss by the prevention of the <u>status quo</u> which plaintiffs seek, it is respectfully submitted that no bond should be required.

48.    For the reason set forth herein, and in the accompanying Declaration of Todd D. Gillespie, plaintiffs respectfully request that the Court grant this application in its entirety and issue the temporary and preliminary injunctive relief requested.

49.    No prior application has been made for the relief sought herein.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at New York, NY
July 10, 2006

_____
Charles D. Schmerler

14

Charles D. Schmerler  (CS0953)
Mark A. Robertson (MR8906)
Joann Kahn (JK8671)
FULBRIGHT & JAWORSKI L.L.P.
666 Fifth Avenue
New York, NY  10103
(212) 318-3000
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

GVEC RESOURCE, INC. and PRIVATE EQUITY
MANAGEMENT GROUP, INC.,

                    Plaintiffs,

        - against -

STRATEGY INTERNATIONAL INSURANCE GROUP,
INC., STRATEGY INVESTMENTS, LLC,
STRATEGY RESORT FINANCING, INC.,
JOHN HAMILTON and MICHAEL KELLY,

                    Defendants.

-------------------------------------------------------------------x

____Civ.____

**DECLARATION OF**
**TODD D. GILLESPIE**

      TODD D. GILLESPIE declares as follows under 18 U.S.C. §1746 and pursuant to penalty of perjury:

      1.    I am a Managing Director of Equity Resource Management Ltd., the Advisor to plaintiff GVEC Resource, Inc. ("GVECR"), and a Managing Director of plaintiff Private Equity Management Group ("PEMG").  I submit this Declaration in support of plaintiffs' motion for a temporary restraining order and preliminary injunction restraining defendants Strategy International Insurance Group ("SIIG"), Strategy Investments LLC ("SILLC") and Strategy Resort Financing, Inc. (Ontario)("SRFI") from transferring or impairing the 100% membership



interest of SIIG in SILLC or the equity position held by SILLC in the time-share development projects discussed below.

2.      As I discuss more fully below, GVECR is the lender of over $20 million to defendant SILLC in connection with three time share real estate projects being developed by Shell Vacations, LLC ("Shell").   The loan is guaranteed by defendants SIIG and SRFI. GVECR's loan is collateralized by second mortgages and notes held by SILLC.  SILLC agreed to provide additional collateral in the form of a guaranty bond or insurance policy in the full amount of the loan, which was to be reinsured by an "A" or better rated insurance carrier. SIIG was to deliver to GVECR its 100% membership interest in its subsidiary, SILLC (the "Member Interest"), as collateral for SILLC's obligation to provide the bond.  SILLC in turn, holds the right to be paid 45% of the cash flow from the three projects after payment of certain fees and expenses (the "Equity Interest").  For this reason, the Equity Interest has considerable value as collateral.

3.      The availability of these various forms of collateral was integral to GVECR's willingness to make the loan to SILLC. Absent the collateral, GVECR would not have made the loan.

4.      SILLC and SIIG now have failed and refused to post the required security, or to deliver the Member Interest, and therefore are in default under the loan agreement and several related loan documents.  At the same time, a Shell affiliate has instituted a lawsuit against SIIG and an SIIG subsidiary, which holds the first mortgage on one of the development properties, alleging that they have failed and refused to fund the development in compliance with their contractual obligations.  The complaint also alleges fraudulent misrepresentation in connection with statements concerning the financial condition of SIIG and its affiliates.

5.      As a direct consequence of the acts of defendants and their affiliates, GVECR and PEMG have been exposed to losses in excess of $30 million, a sum which we believe the Strategy companies cannot repay.  As I discuss below, injunctive relief is needed urgently.  Not only is plaintiffs' financial position in jeopardy, but we believe that SIIG has been negotiating to transfer the Member Interest in SILLC – and therefore control over the Equity Interest – to a third party.  At the same time, we believe that Strategy has been diverting funds which properly should be made available for development of the project to that same third party.

6.      The conduct of the Strategy companies exposes plaintiffs to extraordinary financial loss and threatens to halt development of the projects.  We therefore respectfully submit that injunctive relief to preserve the collateral and the project funds is singularly appropriate.

## The Nature of The Relief Requested

7.      The nature of the interim relief requested by GVECR and PEMG is narrow and directed entirely to the preservation of its collateral.  The right to that relief derives directly from the loan documents.

8.      Specifically, plaintiffs are requesting that the Court direct SILLC and its parent, SIIG, to take no steps whatsoever to impair the Member Interest which has been pledged to both GVECR and PEMG in two separate agreements – an Interim Pledge Agreement and a Management Fee Pledge Agreement.  These agreements are discussed in detail at paragraphs 43 through 55 below.  The agreements specifically provide that SIIG and SILLC shall take no steps to impair plaintiffs' rights in the Member Interest.  They provide further that SIIG shall deliver to plaintiffs the certificates representing SIIG's 100% interest in SILLC.   Accordingly, the provisional relief we request is a contractual right established in the agreements with SIIG, SRFI and SILLC.

31155577.1

3

9.      In addition, we have requested that the Court enjoin SILLC from transferring or otherwise impairing its Equity Interest in the Shell project.  We believe that SILLC's principal asset is that position, and the Equity Interest is the basis for our having sought the Member Interest as collateral.  The Member Interest would be materially devalued should SILLC's rights to the cash flow from the projects be transferred or otherwise impaired.

**Background**

10.      GVECR is a British Virgin Islands company which invests in time share real estate projects.  PEMG is a financial consulting group based in Irvine, California.  PEMG acts as the servicer to GVECR on its investments.  PEMG for several years has structured transactions for its clients seeking to invest funds in senior life settlement insurance policies.

11.      In early 2005, PEMG entered into discussions with Strategy Insurance Limited ("SIL"), a Barbados-based insurer and subsidiary of SIIG.  At the time, SIL indicated that it needed to acquire assets in order to remain in compliance with its statutory capital requirements under Barbados law.  Pursuant to the terms of a Letter Agreement, executed September 14, 2005, Genesis Voyager Equity Corporation ("GVEC"), a BVI company, agreed to contribute to a wholly-owned subsidiary of SIL its beneficial interests in a portfolio of life settlement insurance policies having a face value of not less than $125,000,000.00.  A copy of the Letter Agreement is attached as Exhibit 1.  As a condition for GVEC's performance, the Letter Agreement provided as follows:

1.2      Certain Economics and Covenants Regarding the Portfolio

(d)      Not later than January 15, 2006, Strategy shall procure, for at least a six year period (such period to commence on January 15, 2006), for the benefit of the Trustee for each Trust, a credit default insurance policy, insuring the Initial Policies and Replacement Policies thereof, on terms substantially similar to the binder of insurance issued by Strategy for the benefit of the Trustee on August 2, 2005 (the "Portfolio Insurance").  The Portfolio Insurance shall be

31155577.1

issued by an entity having a credit rating of at Least A- by Standard and Poor's or similar rating by Moody's, Fitch or A.M. Best (the "Required Rating"). If at any time after the issuance of the Portfolio Insurance the issuer's rating is thereafter downgraded below the Required Rating, Strategy shall obtain replacement Portfolio Insurance from an issuer having such Required Rating, within thirty days following such downgrade.

12.     The Letter Agreement provided further that in the event the transaction did not close by October 15, 2005, for any reason other than a decision by GVEC or PEMG not to proceed or the failure of GVEC or PEMG to satisfy certain preconditions, SIIG would be obligated to make a "break-up fee" payment to PEMG in the amount of $2,000,000.00. Ex. 1 at ¶ 3.3.

13.     SIIG subsequently was unable to deliver the credit default policy required by the Letter Agreement, and the transaction did not close. GVEC therefore demanded that SIIG make payment of the $2 million break-up fee.

14.     At or about the same time, defendant John Hamilton and Sandro Sordi, controlling shareholders of both SIIG and a small Canadian company publicly traded in the U.S., the RS Group of Companies ("RSG"), proposed that GVECR participate as a lender in the Shell project. Hamilton stated that SILLC would be in a position to provide a bond and reinsurance on the transaction. Rather than initiate an adversarial process at that time to recover the $2 million break-up fee, plaintiffs agreed to review the project. GVEC specifically reserved its rights to pursue the break-up fee at a later date.

15.     Significantly, we later learned that SIIG had filed a form 10-QSB with the SEC in December 2005 stating that the parties had agreed mutually to terminate the senior life settlement transaction. That statement was knowingly false, and GVEC demanded that it be corrected. Strategy has refused. A copy of the relevant portion of the form 10-QSB is attached as Exhibit 2.

**The Shell Project**

16.     Shell Vacation Homes Inc. ("Shell") is one of the largest independent developers of time share real estate projects in the United States.  The project at issue here involves three separate developments, located in Napa Valley, California, Waikiki, Hawaii, and British Columbia, Canada.  As to each of these projects, a Shell affiliate sought and obtained financing through a Strategy company.  With respect to the Waikiki and Napa properties, the lender is Strategy Resort Financing, Inc. (Florida) ("Strategy Resort"); with respect to the BC project, the lender is Hamsor, Inc.[1]  The borrower in each case is a Shell affiliate – SVC-Napa, SVC-Waikiki and SVC-Mountainside.  Each has executed and delivered a first mortgage and first note with respect to the relevant property.  Copies of the Notes and Mortgages are attached as Exhibit 3.

17.     It appears that the Strategy companies were unable to fulfill their loan commitments on each of the projects.  Accordingly, Strategy Resort in turn secured financing from Veritas High Yield Arbitrage Funds LLC and certain of its affiliates (together, "Veritas").  The Veritas name is used in at least three of the funds sponsored by Argent Funds Group, a group of funds based in Greenwich, Connecticut, which are affiliated with McMahan Securities.

18.     Upon information and belief, the various Veritas entities made a loan payment or payments to Strategy Resort in the total amount of approximately $56 million, and in turn received  interest only Notes.  Copies of the Notes are attached as Exhibit 4.

19.     Although Veritas apparently transferred the approximate sum of $56 million to Strategy Resort, upon information and belief, Strategy Resort and Hamsor were not obligated contractually to make the full amount of those funds immediately available to each SVC

---

[1] The name Hamsor apparently derives from the last names of two of the principals in RSG – John Hamilton and Sandro Sorti. We understand that Hamsor in fact is an affiliate of the Strategy companies.

borrower. Instead, each was obligated to make loans to SVC-Waikiki and SVC-Mountainside in the amount of $32,500,000.00, and Strategy Resort was obligated to lend to SVC-Napa the amount of $23.5 million. The Napa loan, however, was a revolving line of credit, which obligated Strategy Resort to make loans in tranches, with no more than $23.5 million outstanding at any one time. In turn, as monies were received from the buyers of the time shares, a certain percentage was to be allocated to pay down the outstanding balance of the Strategy Resort loan. Strategy Resort then would become obligated to loan additional amounts to SVC-Napa. The issues which have arisen from the apparent misuse and misallocation of these funds are discussed below at paragraph 74.

20.    In connection with the Shell Project, SILLC entered into second promissory notes with respect to each of the three properties in the total amount of $ 16,400,000.00. Copies of the promissory notes are attached as Exhibits 5 through 7.

## The GVECR/ Strategy Loan Agreement

21.    In or about late 2005, defendants Hamilton and Sordi advised GVECR that SILLC would require funds to meet its loan obligations to each of the SVC entities. Strategy proposed that GVECR act as a lender to SILLC, which in turn would loan the funds to the SVC entities.

22.    GVECR advised SILLC that it would not participate in the transaction absent adequate security, including, among other things, a guaranty bond or insurance policy reinsured by a carrier rated "A" or better.

23.    At or about the same time, defendant Hamilton and Sordi, represented to me that the Strategy companies owned a broker in the Lloyds of London market, and that procurement of

the reinsurance policy was a certainty.  In reliance upon that representation, GVECR agreed to act as a lender.

24.    Significantly, Hamilton, Sordi and SILLC failed to disclose to GVECR and to PEMG numerous material and negative facts about the principals of SILLC and certain of the affiliated Strategy companies.  Among other things, SILLC failed to disclose to GVECR and PEMG the following:

- SIIG, the guarantor of SILLC's obligations, and three of its principals, were about to be sued in federal district court in New York by several investment funds in connection with an allegedly fraudulent scheme to obtain $50 million in investments.

- Certain investors had alleged that SIIG had materially misstated its financial statements in filings with the SEC.

- Hamilton had been named as defendants in a $20 million lawsuit for fraud in Florida.

- Sordi had been found liable for fraud in 2002 in a Florida lawsuit and ordered to pay damages of nearly one million dollars.

25.    Had GVEC and PEMG been made aware of these facts, neither of the companies would have agreed to participate in a loan to SILLC.  SILLC and SIIG did not disclose any of these facts.

26.    GVECR and SILLC thereafter entered into a Loan Agreement, made and entered into as of January 26, 2006 (the "Loan Agreement").  The Loan Agreement was executed by defendants SIIG and SRFI as guarantors, and by PEMG, as Facilitator.  A copy of the Loan Agreement is attached as Exhibit 8.

27.    In consideration of the agreement by GVECR to loan $29 million, SILLC agreed to the following:

a.   To provide an insurance policy or payment bond securing repayment of principal and interest in the total amount of $31,900,000.00 underwritten by Strategy Insurance Limited ("SIL"), a Barbados affiliate of SILLC, which was to be retroceded to an insurance or financial guaranty company rated "A" or better; and

b.   To provide an opinion letter from the law firm of Baker & McKenzie in a form acceptable to GVECR stating that the insurance policy had been retroceded to an insurance or financial guaranty company rated "A" or better.

28.   The Loan Agreement provided further that SILLC would indemnify and hold harmless GVECR from any loss pertaining to the loan, including reasonable expenses and attorneys' fees, and that SILLC would pay all costs, expenses and attorneys' fees of GVECR in connection with any claim or action regarding any of the Loan Documents (as defined in the Loan Agreement) or any protection of the liens and security interests under the Loan Documents. See Ex. 8, Sections 6.4 and 7.1(b)(vi).

29.   The Loan Agreement provides for an Event of Default as follows:

7.1     Event of Default and Remedies

(a)   Event of Default. An "Event of Default" under the Agreement means (i) the failure to pay any payment as and when required under this Agreement or the Note (after the expiration of any applicable grace period); (ii) failure to perform or observe any covenant or agreement contained herein and such failure shall continue for 30 days after receipt of written notice thereof from the other party, or if cure is not possible within such time, the failure to diligently pursue a cure and cure within a reasonable time; (iii) any representation, warranty, certification or statement of fact made by hereto or in any Loan Documents or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; (iv) there shall be an event of default under any other Loan Document; or (v) insolvency of Borrower, the issuer of the Surety Bond or of the Insurance Policy, or a reinsurer or an endorser, (vi) an assignment made or attempted to be made by Borrower or guarantor as described in Section 8.4 without the written consent of the Lender, (vii) release of any of the Assignments or the Secured Promissory Notes listed in Exhibits B,C, and D without the written consent of Holder or (viii) a default by

Borrower or any guarantor or their subsidiaries under the promissory notes, deed of trust, or mortgages relating to the properties on which the Assignments relate.

30.     The Loan Agreement provides further that upon the occurrence of an Event of Default, GVECR may declare the loan immediately due and payable, and that its rights under the Loan Documents are cumulative.

31.     Concurrent with the Loan Agreement, plaintiffs GVECR and PEMG executed several additional documents related to the term of the loan. These documents include a Note, Management Agreement, Management Fee Pledge Agreement, Interim Pledge Agreement and Escrow Agreement. Each of these sets forth terms relevant to the claims made herein, and therefore I discuss each of these agreements below.

**The Promissory Note**

32.     The repayment of the loan by GVECR is evidenced by a Promissory Note, dated January 26, 2006, made by SILLC in favor of GVECR (the "Note"). The Note is executed by SIIG and SRFI as guarantors. A copy of the Note is attached as Exhibit 9.

33.     The Note is secured by three collateral assignments of mortgages and related obligations by SILLC in favor of GVECR. See Exhibit 9 at Exhibit "A," p. 7. Copies of the collateral assignments listed in Exhibit "A" to the Note are attached as Exhibits 10 to 12.

34.     The Note defines an Event of Default:

> 4. <u>Event of Default</u>. An "Event of Default" under this Note means
>
> (i)     the failure to pay any payment as and when required under this Note;
>
> (ii)    default under any of the Loan Documents;
>
> (iii)   default under any of the Secured Promissory Notes listed in Exhibit B; or
>
> (iv)    release of any of the Assignments or the Secured Promissory Notes listed in Exhibit B without the written consent of Holder.

35.    The Note defines "Loan Documents" as follows:

> This Note, the Loan Agreement, the Assignments, the Interest Reserve, the Surety Bond and all other documents evidencing or securing the loan or executed in connection with the Loan, (and any modification, renewal, or extension of any of the foregoing)....Exhibit 9 at p. 1.

36.    Accordingly, any default under the Interim Pledge Agreement, the Management Agreement or the Management Pledge Agreement, each discussed below, constitutes an Event of Default under the Note.  In turn, any default under the Note constitutes an Event of Default under the Loan Agreement.

37.    The Note provides that upon the occurrence of an Event of Default, GVECR may declare the loan amount immediately due and payable.  Exhibit 9 at ¶4(b)(i).  The Note further provides that SILLC shall be liable for all reasonable costs and attorneys' fees incurred by GVECR in connection with efforts to collect the loan amount or protect the liens and security interests of the Loan Documents, or legal representation in any proceeding in connection with the Loan Documents.  Exhibit 9 at ¶4(b)(vi).

**The Management Agreement**

38.    Concurrent with the Loan Agreement and the Note, SILLC and PEMG entered into a Management Agreement, made as of January 26, 2006 (the "Management Agreement"). SIIG is a signatory to the Management Agreement as guarantor of the obligations of SILLC.  A copy of the Management Agreement is attached as Exhibit 13.

39.    Pursuant to the terms of the Management Agreement, PEMG was to arrange and facilitate the Loan Agreement and Note and to monitor the collection of revenues by SILLC to make certain payments of funds received.  PEMG also at its discretion had the opportunity to

31155577.1

cover any shortfall should the funds received by SILLC from Shell be insufficient to retire the Note.  Exhibit 13 at ¶2(c)(ii).

40.   As compensation (the "Management Fee"), PEMG was to be paid as follows:

3.   Compensation.  PEMG shall receive the following compensation ("Management Fee"):

a.   PEMG shall receive Nine Million United States Dollars ($9,000,000) as its fee on a priority basis, but such fee shall be payable only from all revenues received by SILLC after payments to the Sinking Fund but before any other payments for expenses and other borrowings and distributions ("Priority Payment").

b.   A fee equal to the Shortfall, if PEMG covers the Shortfall for covering the Shortfall ("Shortfall Fee").

c.   Interest on the Shortfall in the amount of eighteen percent (18%) per annum ("shortfall Interest") until the Shortfall is repaid in full.

d.   The Priority Payment, Shortfall, the Shortfall Fee and the Shortfall Interest shall be paid from the Shell payments or other sources of SILLC, after funding of the Sinking Fund, and before any other payments or obligations of SILLC.

41.   Events of Default under the Management Agreement include "[a] default of SILLC or any guarantor or their subsidiaries under the Promissory Notes, the Secured Promissory Notes, Deeds of Trust, Mortgages or Assignments." Exhibit 13 at ¶5(a)(vii).

42.   Upon the occurrence of an Event of Default, PEMG has the right to declare the Management Fee immediately due and payable.  Exhibit 13 at ¶5(b)(i).  The Management Agreement further provides that SILLC shall pay all reasonable costs, attorneys' fees and expenses incurred by PEMG in connection with any attorney engaged by PEMG to, among other things, collect the Management Fee, protect any liens or security interests under the Management

Agreement or represent PEMG in connection with the Management Agreement.  Exhibit 13 at ¶5(b)(vi).

**The Management Fee Pledge Agreement**

43.    In order to secure the obligations of SILLC and SIIG, as guarantor, under the Management Agreement, PEMG and SIIG entered into a Management Fee Pledge Agreement, dated as of January 26, 2006 (the "Management Fee Pledge Agreement").  A copy of the Management Fee Pledge Agreement is attached as Exhibit 14.

44.    As part of the Management Fee Pledge Agreement, SIIG represented and warranted that it is the sole legal and beneficial owner of one hundred percent of the membership interest in its subsidiary, SILLC ("the "Member Interest").  Exhibit 14 at ¶4(a).  SIIG further represented and warranted as follows:

> For the pledge of the Pledged Member Interest pursuant to this Management Fee Pledge Agreement creates a valid and perfected first priority security interest in the Pledged Member Interest, in favor of the Pledgee securing the performance of the Obligation….Exhibit 14 at ¶4(d)(i).

45.    The "Obligation" is defined as the payment of the Management Fee by SILLC. Exhibit 14 at ¶2.

46.    Significantly, SIIG pledged as follows:

> Simultaneously herewith, the Pledgor is delivering to the Pledgee [PEMG] the certificate, if any, representing the Member Interest, together with the Member Interest power, duly executed in blank.  The Pledgor will deliver to the Pledgee the certificate, if any, representing any Additional member Interest [defined as additional membership interest acquired by SIIG in SILLC after the date hereof], together with Additional Member Interest power, duly executed in blank, and acquired by the Pledgor.  Exhibit 14 at ¶2.

47.    In addition, and of equal significance, SIIG agreed that it would take no action which, in the judgment of PEMG, would "impair the Pledged Member Interest or which would

be inconsistent with or result in any violation of any provision of the Management Agreement, this Management Fee Pledge Agreement, the Interim Pledge Agreement [see ¶48 below] or any other document or instrument related to the foregoing or the transaction contemplated thereby ...." Exhibit 14 at ¶5.

## The Interim Pledge Agreement

48.     On the date scheduled for the closing of the loan transaction, SILLC was unable to post the guaranty bond or insurance policy reinsured by a company rated "A" or better.  In addition, Baker & McKenzie was unable to provide an opinion letter stating that the guaranty or policy in fact was backed by an insurer rated "A" or better.

49.     In order to allow the loan to fund, GVECR, SILLC and SIIG entered into an Interim Pledge Agreement, dated as of January 26, 2006 (the "Interim Pledge Agreement").  A copy of the Interim Pledge Agreement is attached as Exhibit 15.

50.     The Interim Pledge Agreement provides that "SILLC shall obtain the Financial Guarantee on or before May 31, 2006." Exhibit 15 at ¶2.[2]

51.     As collateral "until the Financial Guarantee is obtained by SILLC," defined as the "Obligation," SIIG, as pledgor, pledged the 100% Member Interest in SILLC. Exhibit 15 at ¶2.

52.     The Interim Pledge Agreement contains several provisions which mirror those of the Management Fee Pledge Agreement.   Specifically, SIIG is to deliver the certificates representing the Member Interest and Additional Member Interest, together with the Member Interest Power, executed in blank (¶2); SIIG represents that it controls 100% of the membership

---

[2] "Financial Guarantee" is defined as "a financial guarantee in the amount of US $31,900,000, to support a payment bond or insurance policy, from a provider rated not less than "A." Exhibit 15 at ¶2.

interest in SILLC (¶4(a)); and SIIG pledges to take no action which in the reasonable judgment of GVECR would impair the Member Interest or be inconsistent with or violate any of the Loan Documents (¶5).

53.     Both the Interim Pledge Agreement and the Management Fee Pledge Agreement provide that upon the occurrence of an Event of Default, PEMG and GVECR may transfer the Pledged Member Interest into the name of the Pledgee, and the Pledgee shall have ownership of the Pledged Member Interest. Exhibit 15 at ¶8(a); Exhibit 14 at ¶8(a).

54.     The rights of PEMG under the Management Fee Pledge Agreement are subordinate to those of GVECR under the Interim Pledge Agreement. Exhibit 15 at ¶4(d)(ii)..

55.     Both the Management Fee Pledge Agreement and the Interim Pledge Agreement were of material significance to GVECR and PEMG, which would not have participated in the transaction otherwise. Specifically, the preservation and pledge of the SIIG Member Interest permitted GVECR and PEMG to take as security the control of SILLC and its Equity Position in the Shell project. Absent a guaranty, that was the essential collateral available to GVECR and PEMG.

**The Escrow Agreement**

56.     The final agreement of relevance to the claims herein and the relief requested is an Escrow Agreement, dated as of April 4, 2006, by and among SILLC, SRFI, SIIG, John Hamilton, Michael Kelly, GVECR, PEMG and Baker & McKenzie, as Escrow Agent (the "Escrow Agreement"). A copy of the Escrow Agreement is attached as Exhibit 16. The Escrow Agreement addresses the posting of the payment bond, which SILLC had failed to do, and the mechanism for payment of the premium for the bond and the reinsurance thereof by a company rated "A" or better.

57.     The Escrow Agreement provides that "Hamilton and Kelly have agreed to pay the premium for the Payment Bond and the Reinsurance," and that "GVECR has agreed to reimburse Hamilton and Kelly upon receipt of the Payment Bond and Reinsurance in good order and authorized form." Exhibit 16 at p. 1 (emphasis added).

58.     The Escrow Agreement provides that Baker & McKenzie, as Escrow Agent, shall disburse to Hamilton and Kelly $2,714,250 as reimbursement for the premium paid by them upon receipt of the following documents:

2.     Release from Escrow.

(b)     Initial Disbursement: Escrow Agent upon receipt of all of the Documents specified in this Section 2(b)(i) in the form attached hereto, except as waived by GVECR and PEMG, will make the Initial Disbursements listed in Section 2(b)(ii):

(i)     Documents

(1)     Loan Agreement (an executed original);

(2)     Promissory Note (an executed original);

(3)     Financial Guarantee:

a.     Payment Bond from Builder's and Contractor's Assurance Co., Ltd. ("Builders")(draft in the form to be issued at closing); or

b.     Insurance Policy from Strategy Insurance Limited ("SIL")(draft in the form to be issued at closing);

(4)     Reinsurance

a.     Reinsurance Cover Attachment (draft in the form to be issued at closing); or

b.     Direct Endorsement (draft in the form to be issued at closing);

31155577.1

16

57.    The Escrow Agreement provides that "Hamilton and Kelly have agreed to pay the premium for the Payment Bond and the Reinsurance," and that "GVECR has agreed to reimburse Hamilton and Kelly <u>upon receipt of the Payment Bond and Reinsurance in good order and authorized form</u>." Exhibit 16 at p. 1 (emphasis added).

58.    The Escrow Agreement provides that Baker & McKenzie, as Escrow Agent, shall disburse to Hamilton and Kelly $2,714,250 as reimbursement for the premium paid by them upon receipt of the following documents:

> 2.    <u>Release from Escrow</u>.
>
> (b)    Initial Disbursement: Escrow Agent upon receipt of all of the Documents specified in this Section 2(b)(i) in the form attached hereto, except as waived by GVECR and PEMG, will make the Initial Disbursements listed in Section 2(b)(ii):
>
> > (i)    Documents
> >
> > > (1)    Loan Agreement (an executed original);
> > >
> > > (2)    Promissory Note (an executed original);
> > >
> > > (3)    Financial Guarantee:
> > >
> > > > a.    Payment Bond from Builder's and Contractor's Assurance Co., Ltd. ("Builders")(draft in the form to be issued at closing); or
> > > >
> > > > b.    Insurance Policy from Strategy Insurance Limited ("SIL")(draft in the form to be issued at closing);
> > >
> > > (4)    Reinsurance
> > >
> > > > a.    Reinsurance Cover Attachment (draft in the form to be issued at closing); or
> > > >
> > > > b.    Direct Endorsement (draft in the form to be issued at closing);

31155577.1

16

(5)     Opinion Letter of Baker & McKenzie LLP
regarding Bond or Policy (draft in the form to be
issued at closing);

59.     The Escrow Agreement provides further that if funds sufficient for disbursement are not available, then the Escrow Agent shall require that GVECR deliver such funds within three business days of such request. Exhibit 16 at ¶1(b).

60.     The Escrow Agreement is clear on its face that Hamilton and Kelly are obligated to advance the premium for the guaranty and reinsurance, and that upon the receipt of documents in good order, GVECR is obligated to reimburse that advance payment. As discussed below at ¶69-70, these provisions have become central to the dispute as a consequence of Strategy's wrongful assertion that GVECR is obligated to make payment of the premium prior to tender of the guaranty and reinsurance by SILLC.

**Strategy's Failure to Disclose the Impending $50 million Litigation**

61.     At or about the time GVECR and PEMG executed the various Loan Documents, upon information and belief, SIIG, Hamilton, Sordi and the Strategy companies knew or should have known of an impending lawsuit against them by several investors in a real estate project in Toronto, seeking damages for fraud in an amount in excess of $50 million. Defendants failed to disclose the dispute or the impending claims. Had GVECR or PEMG known of these issues, or of the allegations set forth in the Complaint which subsequently was filed, they never would have agreed to provide funding to SILLC.

62.     Attached hereto as Exhibit 17 is a Complaint filed in this Court in February 2006 against SIIG, Strategy Real Estate Investments Ltd. ("SREI"), Stephen Stonhill, Sandro Sordi and John Hamilton. The plaintiffs are various investment funds which allegedly invested $50

31155577.1

million in a private offering made by SREI. The funds purportedly were to be invested in certain special purpose residential real estate properties in Canada being developed by Lux Group, Inc., a Canadian company allegedly under common control with SREI.

63.     The Complaint alleges that defendants made numerous fraudulent misrepresentations in filings with the SEC, and that the filings were false and misleading.

64.     The complaint alleges further that defendants had failed to disclose that Hamilton and Sordi had been named as defendants in a $20 million fraud lawsuit, that Sordi had been found liable in a Florida lawsuit for nearly $1 million in damages arising from claims of fraud, and that SIIG was in a significantly negative financial condition.

65.     SIIG and SILLC failed to disclose either the existence of a dispute with these investors or the threat of litigation, and failed to disclose any of the matters alleged in the complaint. Had PEMG or GVECR known of any of this, they would not have agreed to loan funds to SILLC.

**Defendants' Breach Of The Loan Documents**

66.     Between the closing of the loan transaction and May 31, 2006, GVECR and PEMG continued to demand that SILLC post the guaranty and reinsurance, and that SIIG deliver the Member Interest. SILLC and SIIG failed and refused to do either.

67.     By letter dated May 1, 2006, GVECR reminded SIIG of the obligation to post the financial guaranty by May 31, 2006 and to deliver the Member Interest. A copy of the letter is attached as Exhibit 18. No response was received.

68.     By letter dated May 18, 2006 to SIIG, SILLC and SRFI, GVECR again reminded defendants of their obligations, and requested the courtesy of notice if the obligation would not be met. A copy of the letter is attached as Exhibit 19.

31155577.1

69.     SIIG responded by letter dated May 24, 2006.  A copy of the letter is attached as Exhibit 20.  In the May 24 letter, SIIG asserted that <u>all</u> of the loan documents were of no force and effect because GVECR had failed to fund the loan.  Specifically, SIIG asserted that it could not obtain the financial guaranty because GVECR had failed to honor its obligation to fund the $2,741,250 for premium.

70.     As discussed above at ¶¶56-60, the Escrow Agreement provided in clearest terms that the premium payment for the guaranty and reinsurance were to be paid by defendants Hamilton and Kelly, and that <u>upon delivery of the documents in good order</u>, GVECR was to fund the premium to reimburse the advance.  GVECR had no obligation whatsoever to advance the funds to pay the premium.  In addition, the SIIG letter failed even to address SIIG's clear obligation to deliver the Member Interest pursuant to the Management Pledge Agreement and Interim Pledge Agreement.

71.     SILLC failed to post the guaranty and reinsurance on May 31, 2006.  The Member Interest has not been delivered.

72.     By letter dated June 2, 2006, GVECR and PEMG gave written notice to SILLC, SIIG and SRFI of the occurrence of a default.  A copy of the letter is attached as Exhibit 21.  To date, no guaranty or reinsurance has been posted, and the Member Interest has not been delivered.

**The Shell Lawsuit**

73.     In or about early 2006, GVECR and PEMG were advised by Shell that Shell had been unable to obtain a Final Time Share Public Report from the State of California in connection with the Napa development.  Shell subsequently requested that each of GVECR, Strategy and Veritas make certain economic concessions in order to bring the Napa property into

31155577.1

compliance with the California State statutory requirements.  Shell advised that it could not sell memberships in the Napa time-share project without such compliance.

74.    At or about the same time, GVECR and PEMG were advised by Veritas that it believed that Strategy Resort had improperly misappropriated approximately $11 million of cash flow generated by the Shell project and paid to Strategy Resort.  Although the Notes made by Strategy borrowers in favor of the Veritas lenders provide for payment only of interest on a quarterly basis, Veritas stated that the cash flow properly was to have been paid by Strategy Resort to Veritas pursuant to the terms of an agreement between Veritas and Strategy Resort. Purportedly as a consequence of this alleged misappropriation of funds, upon the subsequent failure of Strategy Resort to fund draw requests by SVC-Napa pursuant to the first note between SVC-Napa and Strategy Resort, Veritas in turn refused a demand by SVC – Napa to fund draw requests.

75.    In or about mid-May, Shell requested a meeting with Veritas, Strategy and GVECR to address the issues set forth above.  The parties were unable to schedule such a meeting over the next two weeks.

76.    Shell thereupon delivered to each of the parties a courtesy copy of a complaint which it had filed in the United States District Court for the Northern District of California.  In a cover letter delivered with the complaint, Shell stated that it still desired a meeting.  Veritas refused to attend such a meeting.

77.    Shell thereafter served its complaint upon each of the parties.[3]  A copy of the complaint (the "Shell Complaint") is attached as Exhibit 22.

---

[3] Upon information and belief, none of the named defendants, including GVECR, have acknowledged proper service of process.

78.    The Shell Complaint alleges that Strategy Resort had improperly assigned the First Note and First Mortgage in the Napa project to Veritas in violation of clearly stated provisions requiring the prior written consent of Shell, which allegedly was not given. The Shell Complaint alleges further that the interest rate set forth in the first and second notes on the Napa project violates the usury laws of the State of California. The Shell Complaint also alleges that Veritas has acted in bad faith by refusing to fund the First Note, and that all defendants have acted in bad faith by failing to cooperate with Shell's efforts to obtain statutory compliance under California law.

79.    Significantly, the Shell Complaint alleges that Strategy Resort and SILLC fraudulently induced Shell to enter into the loan transaction based on knowingly false statements regarding their true financial condition, including their inability to perform under the loan agreement. The allegations made by Shell echo those set forth in the New York Complaint against Strategy filed by the investors in Lux, Inc. See Exhibit 17. At the same time Shell was preparing to serve its complaint, Strategy requested a meeting with GVECR and PEMG. The meeting was held at PEMG's offices in Irvine, California on June 6. Strategy was represented by its Chief Financial Officer, Louis Lettieri, and its outside counsel, Martin Weisberg of Baker & McKenzie. The meeting also was attended by Michael Kelly of Builders & Contractors, the insurance broker for SIL, who had committed to obtaining the reinsurance of the guaranty and, with John Hamilton, to advancing the premium.

80.    At the meeting, Lettieri and Kelly both represented that SILLC would be in a position to tender the guaranty bond and reinsurance in good order. Mr. Weisberg represented that he would contact GVECR or its outside counsel within days to arrange for delivery and

review of the relevant documents. Mr. Weisberg also stated that he would endeavor to arrange for delivery of the Member Interest.

81.    At the same meeting, Mr. Lettieri continued to insist that GVECR was in default under the Loan Agreement by virtue of its purported failure to fund the premium payment in advance. We rejected that assertion.

82.    Mr. Lettieri also advanced a further position on behalf of SIL, unrelated to the claims made in this lawsuit. I raise this issue because it helps to explain our heightened concern regarding the veracity and financial condition of the Strategy group of companies.

83.    On or about August 2, 2005, SIL issued a Binder of Insurance to GVEC PS D1 Trust for an issued amount of $65,500,000.00. The premium was 6%, or $3,930,000.00. GVEC PS D1 Trust wired the funds to SIL on August 4, 2005. PEMG was to receive a referral fee of 25% of the face amount of the policy. PEMG subsequently agreed to reduce the commission amount to 20%, or $786,000.00.

84.    The policy which subsequently was issued by United Insurance was for a face amount of $60,500,000.00, or $5 million less than the agreed coverage. GVEC PS D1 Trust therefore overpaid  the premium in the amount of 6% of $5 million, or $300,000. SIL therefore owed PEMG and GVEC PS D1 Trust a total of $1,086,000.00.

85.    SIL thereafter in January 2006 issued two separate policies to GVEC PS D1 Trust and GVEC PS C1 Trust in the total insured amount of approximately $22 million. SIL after the issuance of the policies demanded commissions in an amount equal to 10% of the fee amount, or $2.2 million. The Trusts objected that only a 6% commission was appropriate.

86.    Defendant John Hamilton, the controlling shareholder of the Strategy companies, subsequently signed two written acknowledgements that the premium on the policies had been

31155577.1

22

paid. Mr. Hamilton did so because he acknowledged that SIL owed the payments on the United policy, and that in light of the Shell transaction, the parties should agree that no further sums were owed. The acknowledgements are attached as Exhibit 23.

87.     At the June 6 meeting, both Mr. Lettieri and his outside counsel insisted that Hamilton had no authority to act on behalf of the Strategy companies, and that $2.2 million was owed to SIL.

88.     In addition, we now have reason to believe that the SIL policies in fact were never made effective by SIL, and that the two trusts are uninsured. SIL continues to insist that $2.2 million is owed.

89.     There are additional reasons for concern over the financial condition of the Strategy companies. First, in its 2004-2005 Annual Report, SIIG disclosed that its auditors had issued a "going concern" qualification as part of their opinion. The qualification sets forth the doubts of the auditors that SIIG can continue in business as a "going concern."

90.     In addition, we now understand that the RS Group of Companies in Canada has been in the process of laying off personnel. John Hamilton is the controlling shareholder and Chief Executive of RS, and the controlling shareholder of the Strategy companies, which occupy office space in the same building in which RS maintains its offices. We believe that the layoffs reflect a financial weakness at Strategy.

91.     Shortly after the meeting, and after Strategy again had failed to make good on any of its promises, GVECR by letter dated June 14, 2006 advised SILLC and SIIG that they were obligated to indemnify GVECR for all costs, expenses and legal fees incurred in connection with the Shell Action. A copy of the letter is attached as Exhibit 24. See ¶¶28, 37 above. By letter dated June 23, 2006, SILLC and SIIG refused. A copy of the letter is attached as Exhibit 25.

92.     Thirty days now have elapsed since written notice of default was delivered to SIIG and SILLC under the Loan Agreement.  See Exhibit 21.  The guaranty and reinsurance have not been delivered.  The Member Interests have not been delivered.  As set forth in greater detail in the accompanying Declaration of Charles D. Schmerler, lead counsel for GVECR and PEMG, an Event of Default therefore has occurred under the Loan Agreement and the related Loan Documents.  GVECR has given notice to SILLC and SIIG that it has accelerated the loan, and has demanded immediate payment under the Note.

93.     In addition, GVECR and PEMG remain without the collateral promised them under the relevant loan documents, and are exposed to combined losses in excess of $30 million.  Upon information and belief, SILLC and SIIG cannot repay that amount, and therefore performance under the Loan Agreement and Note is dependent upon the ability of GVECR and PEMG to obtain the Member Interest and control over the Equity Position of SILLC in the Shell Projects and the flow of funds to SILLC.

**The Injury To GVECR and PEMG And the Need For Interim Relief**

94.     Unless the Court grants the injunctive relief sought by GVECR and PEMG, plaintiffs will suffer immediate and serious harm which cannot be adequately compensated by an award of monetary damages against SILLC and SIIG.

95.     Upon information and belief, SILLC and SIIG have not nearly the resources to make payment under the Note.  Indeed, rather than funding the loan to Shell, SILLC was compelled to turn to Veritas and GVECR to obtain the required capital.  Various of the Strategy companies, including SIIG and SILLC, have been named as defendants in substantial federal lawsuits seeking tens of millions of dollars in damages based upon allegations of, among other things, fraudulent misstatements regarding the financial condition of the Strategy group of

companies.  It therefore is reasonable to conclude that there is a strong likelihood that SILLC and SIIG cannot meet their financial obligations to PEMG and GVECR.

96.     Plaintiffs therefore must be able to obtain the Member Interest and the Equity Position in the Shell projects , including the cash flow to SILLC.  These rights are clearly provided to GVECR and PEMG in the relevant loan documents.  Accordingly, plaintiffs seek only enforcement of those rights which they hold under the loan documents, and of the obligations which SIIG and SILLC have repeatedly refused to meet.

97.     The entire reason for PEMG and GVECR having insisted on the pledge of the Member Interest under the Interim Pledge Agreement and Management Pledge Agreement was to secure collateral in the event that SILLC did not procure the guaranty and reinsurance.  That is precisely what has occurred.

98.     In addition, I have learned from conversations with Veritas that SIIG and SILLC may be seeking to tender all or part of the Member Interest to Veritas in order to obtain forgiveness of the $11 million in allegedly misappropriated funds (see ¶74 above) and to induce Veritas to agree to fund the remaining draws on the loan to the Napa project.  Such a pledge or transfer of the Member Interest would constitute a direct violation of the Interim Pledge Agreement and Management Pledge Agreement.  Such a transfer would deprive GVECR and PEMG of their bargained for rights, and leave them without adequate collateral for the loan and Management Fee.

99.     There are many troubling issues emanating from the behavior of the Strategy companies.  They have been sued for tens of millions of dollars based upon alleged fraudulent misstatements regarding their financial condition.  They have been unwilling or unable to procure the guaranty and reinsurance which they repeatedly promised would be obtained without

complication, and have deliberately refused to comply with their contractual obligation to deliver the Member Interest.  And, they have refused to acknowledge the receipt of premium payments from GVEC and are attempting to disavow direct representations made by John Hamilton, the controlling shareholder in the companies.  Together with these issues is the serious doubt  that SIIG and SILLC ever could pay the damages to be awarded in this lawsuit if the injunctive relief requested here is not granted.

100.    I respectfully stress the urgent need for the relief we request.  The relief is only that to which GVECR and PEMG are entitled under the loan agreements, and will serve to preserve the status quo and assure that plaintiffs' rights can be enforced.  There will be no harm to defendants.  We believe that the injury to GVECR and PEMG is imminent and irreparable, and only a restraining order can assure that it will not occur.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Irvine, CA
       July ⁷ , 2006

Todd D. Gillespie

31155577.1

26