Charles D. Schmerler (CS0953)
Mark A. Robertson (MR8906)
Joann Kahn (JK8671)
FULBRIGHT & JAWORSKI L.L.P.
666 Fifth Avenue
New York, NY 10103
Telephone: 212-318-3000
Telecopier: 212-318-3400
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
GVEC RESOURCE, INC. and PRIVATE EQUITY
MANAGEMENT GROUP, INC.,

       Plaintiffs,

  - against -

STRATEGY INTERNATIONAL INSURANCE GROUP,
INC., STRATEGY INVESTMENTS, LLC,
STRATEGY RESORT FINANCING, INC.,
JOHN HAMILTON and MICHAEL KELLY,

       Defendants.
------------------------------------------------------------------x

06 CV 5199
Judge Cote

## APPENDIX OF EXHIBITS TO THE DECLARATIONS OF CHARLES D. SCHMERLER AND TODD D. GILLESPIE



**Private Equity Management Group**
Incorporated

One Park Plaza, 5th Floor
Irvine, California 92614
949.757.0977 telephone
949.757.0978 facsimile
www.PEMGroup.com

## FACSIMILE TRANSMITTAL

September 15, 2005

TO: Mr. Todd Gillespie
Mr. Danny Pang
Mr. Nasar Aboubakare
Mr. Larry Swertloff
954-785-4122 facsimile

FROM: Peter Paul Mendel, Esq.
General Counsel
949-757-0977 telephone
949-757-0978 facsimile

RE: GVEC-Strategy

Number of Pages (including cover):   14

Attached is the following:

1. Strategy-GVEC LOI final version 3 2005-09-14
2. Signature pages signed SIIG, SHCL, & SIL

# RUSH
# PLEASE DELIVER IMMEDIATELY

This facsimile transmittal and any attachments contain CONFIDENTIAL and ATTORNEY-CLIENT information intended solely for use by the intended individual or entity recipient. If you are not the intended recipient or do not believe you are the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this transmission is prohibited. If you have received this transmission in error, please notify us by telephone immediately. Please destroy this transmission and do not use or forward it. If you do not receive the complete transmissions or any attachments, please call sender IMMEDIATELY at the number and address stated.



Exhibit 1

Strategy International Insurance Group, Inc.

Genesis Voyager Equity Corporation
BF, No. 97, Tun-Hwa South Road, Sec. 2
Taipei, Taiwan R.O.C.

Private Equity Management Group, Inc.
One Park Plaza, Suite 550
Irvine, Ca 92614

Ladies and Gentlemen:

Strategy International Insurance Group, Inc., a Texas corporation ("Strategy"), Strategy Holding Company Limited, a Barbados company and a subsidiary of Strategy ("Holdings"), Strategy Insurance Limited, a Barbados company and a subsidiary of Holdings ("Insurance"), Private Equity Management Group, Inc., a Nevada corporation ("PEMG") and Genesis Voyager Equity Corporation, an international business company organized under the laws of the British Virgin Islands ("GVEC") have entered into discussions regarding the terms pursuant to which Strategy, together with certain of its subsidiaries and affiliates, shall enter into certain transactions with PEMG and GVEC, as described in Section 1 below (the "Transactions").

This commitment letter (this "Letter Agreement") sets forth the principal terms that the parties have agreed shall apply to the Transactions. Each party acknowledges that, by executing and delivering a copy of this Letter Agreement to each of the other parties hereto, the same constitutes a legally binding agreement, enforceable against such party in accordance with the terms hereof.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.  THE TRANSACTIONS

   1.1   <u>Investment in the SPV</u>.  GVEC shall contribute (the "Investment"), to a newly created special purpose offshore wholly owned subsidiary of Insurance (the "SPV"), its beneficial interest (the "Beneficial Interest") in a portfolio of life settlement insurance policies of GVEC (the "Initial Policies"), having a face value of not less than

-1-

NYCDMS/446012.9

U.S. $125,000,000, which are held for GVEC's benefit in (i) the GVEC Trust dated January 8, 2004 (the "GVEC PS Trust"), pursuant to the Trust Agreement, dated effective as of January 6, 2004 (the "GVEC PS Trust Agreement"), between GVEC, as grantor and Erwin & Johnson LLP (the "Trustee"); (ii) the GVEC Preferred Shares A Trust dated February 4, 2004 (the "GVEC PSA Trust"), pursuant to the Trust Agreement, dated as of February 4, 2004 (the "GVEC PSA Trust Agreement"), between GVEC, as grantor, and the Trustee, (iii) the GVEC Notes A Trust dated April 28, 2004 (the "GVEC Notes A Trust"), pursuant to the Trust Agreement, dated as of April 28, 2004 (the "GVEC Notes A Trust Agreement"), between GVEC, as grantor, and the Trustee, and (iv) the GVEC Preferred Shares B1 Trust dated as of February 28, 2005 (the "GVEC PS B1 Trust", and together with the GVEC PS Trust, the GVEC PSA Trust and the GVEC Notes A Trust, collectively, the "Trusts"), pursuant to the Trust Agreement dated as of February 28, 2005 (the "GVEC PS B1 Trust Agreement", and together with the GVEC PS Trust Agreement, the GVEC PSA Trust Agreement and the GVEC Notes A Trust Agreement, collectively, the "Trust Agreements"), between GVEC, as grantor, and the Trustee. The parties agree that the Initial Policies to be contributed shall be listed on an Exhibit to the relevant Definitive Agreement (defined below), as the same shall be amended from time to time regarding Replacement Policies (defined below) and other investments. Upon the making of the Investment, the SPV shall issue to GVEC the Preferred Shares, as defined and more fully discussed in Section 1.3 below.

1.2   Certain Economics and Covenants Regarding the Portfolio.

(a) During the period commencing on the date of the consummation of the Investment and terminating on the date of the Redemption (defined below) (the "Relevant Period") GVEC shall not permit (x) the face value of the Initial Policies, together with any policy replacing a matured, liquidated or sold Initial Policy or other policy (a "Replacement Policy" and, together with the Initial Policies, the "Policies"), plus (y) cash and the face value of any other investments having an investment grade rating of at least an A- by Standard and Poor's or a similar rating by Moody's, Fitch or A.M. Best or a similar short term rating by Standard and Poor's, Moody's, Fitch or A.M. Best ("Equivalent Investment") (collectively, the "Portfolio"), to be less than $125,000,000. During the Relevant Period, the cash flow generated by each of the Policies and any cash and Equivalent Investments in the Portfolio, whether upon the maturity, sale, liquidation or otherwise of any assets in the Portfolio ("Cash Flow"), shall remain in the Portfolio subject to GVEC's right of substitution with respect to Replacement Policies and Equivalent Investments. In no event shall Strategy, Holdings, Insurance or the SPV have any right or claim to any aggregate face value amount, including Cash Flow, of the Portfolio in excess of $125,000,000. GVEC and/or PEMG, as applicable, may use the Cash Flow to acquire either a Replacement Policy or, as may be determined by them, an Equivalent Investment having at least an A- rating by Standard and Poor's or a similar rating by Moody's, Fitch or A.M. Best ("Required Rating"). After deducting the cost of the acquired Replacement Policy or Equivalent Investment, GVEC or PEMG may withdraw the balance of the Cash Flow from the Portfolio. Simultaneously with the Redemption (defined below) the Beneficial Interest shall convert into the right to receive the Portfolio outright, and GVEC shall take such

-2-

NYCDMS/446012.9

action as necessary to cause the Trusts (or GVEC, as applicable) to transfer outright legal and beneficial title in the Portfolio (including, without limitation, title to each Policy and other Equivalent Investment therein) to the SPV or its designee.

(b) To the extent that the face value of the Portfolio at any time exceeds $125,000,000, any such excess amount shall be deemed not to be a part of the Portfolio and GVEC or PEMG has the right to withdraw such excess from the Portfolio at any time in its discretion.

(c) GVEC shall ensure that no Replacement Policy or other Equivalent Investment held in the Portfolio shall accrete to par on a maturity date which is past the ten year plus 3 months anniversary of the date of the Investment.

(d) Not later than January 15, 2006, Strategy shall procure, for at least a six year period (such period to commence on January 15, 2006), for the benefit of the Trustee for each Trust, a credit default insurance policy, insuring the Initial Policies and Replacement Policies thereof, on terms substantially similar to the binder of insurance issued by Strategy for the benefit of the Trustee on August 2, 2005 (the "Portfolio Insurance"). The Portfolio Insurance shall be issued by an entity having a credit rating of at least A- by Standard and Poor's or a similar rating by Moody's, Fitch or A.M. Best (the "Required Rating"). If at any time after the issuance of the Portfolio Insurance the issuer's rating is thereafter downgraded below the Required Rating, Strategy shall obtain replacement Portfolio Insurance from an issuer having such Required Rating, within thirty days following such downgrade.

1.3   Preferred Shares.

(a) In consideration for the Beneficial Interest, the SPV shall simultaneously issue to GVEC non-voting redeemable (by the SPV) perpetual preferred shares (the "Preferred Shares"), having the material terms and rights described below and such other customary terms as shall be agreed to by the parties hereto. Simultaneously with the issuance thereto of the Preferred Shares, GVEC shall contribute the relevant fractional interests of the Preferred Shares to the Trusts.

(b) As holder of the Preferred Shares, GVEC shall be entitled to receive, out of funds legally available for the payment of dividends, preferential cash dividends with respect to issued and outstanding Preferred Shares held by GVEC (or the Tusts, as applicable). The dividends will begin to accrue and shall be cumulative on and after January 16, 2006 (the "Dividend Obligation"), and shall be payable quarterly, in arrears when, and if declared by the board of directors, on the fifteenth day of each January, April, July and October (each, a "Payment Date"), in an amount equal to (x) for the period January 16, 2006 through January 15, 2016, $11,250,000 per annum (quarterly payments of $2,812,500 each), and (y) for the period commencing on January 16, 2016, $22,500,000 per annum, provided that, in all cases, the last such payment of the Dividend Obligation shall be made on the date of Redemption (defined below), and shall be in an amount equal to the pro rata portion of the quarterly amount of the then applicable per

-3-

NYCDMS/446012.9

annum Dividend Obligation, based on actual days elapsed during such quarter. If any Payment Date is not a business day (i.e. a day other than a Saturday or Sunday on which commercial banks in New York State are open for the transaction of business), dividends due and owing on such date will be payable on the business day immediately following such date. In addition, if the SPV shall not have exercised the Redemption Right (defined below) on or prior to January 15, 2016, GVEC shall have the right to appoint a majority of the members of the board of directors of the SPV, and management control thereof shall revert to GVEC unless and until the Redemption shall occur.

(c) The Preferred Shares shall be redeemable by the SPV (the "Redemption"), at the option of the SPV (the "Redemption Right"), at any time after the six and one-half year anniversary of the issuance thereof, for an amount equal to the sum of $125,000,000 plus all accrued but unpaid dividends (the "Redemption Amount"). The Redemption Amount shall be payable in one installment on the date of Redemption. Simultaneously with the consummation of the Redemption, GVEC shall take such action as necessary to cause each of the Trusts (or GVEC, as applicable) to transfer outright all legal and beneficial title in the Portfolio (including, without limitation, title to each Policy and other Equivalent Investment) to the SPV or its designee in a face amount of up to $125,000,000.

(d) Not later than January 15, 2006, Strategy shall procure a credit default insurance policy, for the benefit of GVEC, insuring the quarterly payment of $2,812,500 of the Dividend Obligations (the "Dividend Insurance"), and a credit default insurance policy, for the benefit of GVEC, insuring the payment of $125,000,000 of the Redemption Right (the "Redemption Insurance", and together with the Dividend Insurance, collectively, the "Credit Default Insurance Policies"). All such insurance shall be issued by an entity having a credit rating of at least A- by Standard and Poor's or a similar rating by Moody's, Fitch or A.M. Best. If at any time after issuance, the issuer's rating is thereafter downgraded below the Required Rating, Strategy shall obtain a replacement policy from an issuer having the Required Rating, within 30 days following such downgrade. As collateral security for Strategy's obligation to procure the Credit Default Insurance Policies and the Portfolio Insurance, Strategy shall pledge to GVEC all of the issued and outstanding common stock (the "Common Stock") of the SPV held thereby. In the event that Strategy shall fail to procure such Credit Default Insurance Policies and the Portfolio Insurance by January 15, 2006, GVEC's and PEMG's sole remedies ("Remedies") shall be GVEC's right to foreclose on the Common Stock (the "Stock Foreclosure"), take back the Portfolio, and to receive the Penalty Payment (defined below). In such event, after the exercise of the Remedies the Transactions and the Definitive Agreements (defined below) shall be deemed terminated and of no force and effect, and no party hereto shall have any further obligation or liability to any other party hereto under the Definitive Agreements or with respect to the Transactions or as otherwise contemplated hereby.

(e) The Preferred Shares, and all right, title and interest therein, shall not be held by any person or entity other than GVEC and/or the Trust or their designees or assignees.

-4-

NYCDMS/446012.9

(f) The Preferred Shares shall, with respect to the Dividend Obligation, be senior in right to all other classes of stock debentures or notes at any time issued by the SPV.

1.4   Certain Agreements Regarding the SPV.

(a) The parties agree that the SPV shall be created in a mutually agreed upon tax advantageous jurisdiction, and shall cause the SPV to be designated as a "managing general agent" for purposes of originating the underwriting of all insurance policies to be issued by Insurance relating to senior life settlement policies ("Senior Life Settlement Polices") and impaired annuities. In such connection, Insurance shall agree that all Senior Life Settlement Policies underwritten thereby shall be originated by the SPV. The parties further agree that until Strategy shall have procured the Credit Default Insurance Policies, PEMG shall manage the SPV. Thereafter, management control shall revert to Holdings, provided, however, that all determinations regarding the underwriting of Senior Life Settlement Policies and impaired annuities policies shall be made upon the determination of Holdings, subject to final approval, exercisable in its commercially reasonable discretion, of GVEC or its designee (which designee shall be acceptable to Holdings in its commercially reasonable discretion), provided that such approval shall in addition be subject to the JH Veto, as defined below. In addition, until the Redemption, PEMG and GVEC shall have the right to designate one individual to attend, in an advisory capacity only, with no right to vote, meetings of the underwriting committee of Insurance.

(b) Subject to the fiduciary duty of the Board of Directors of Strategy, Holdings and the SPV, John Hamilton shall be appointed outside advisor to the SPV and Holdings in connection with determinations regarding the underwriting of Senior Life Settlement Policies and impaired annuities policies to be underwritten by Insurance. In such capacity, through the date of the Closing until the date of the Redemption, Mr. Hamilton shall have the right to veto (the "JH Veto") any determination of Holdings regarding such underwriting of Senior Life Settlement Policies and impaired annuities policies to be underwritten by Insurance, provided that such veto may be exercised by Mr. Hamilton only in a commercially reasonable manner with an implied fiduciary duty of Mr. Hamilton to Strategy, Holdings and the SPV.

1.5   Portfolio Manager. PEMG shall serve as the manager of the Portfolio (the "Portfolio Manager") pursuant to an agreement to be entered into between the SPV and PEMG (the "Collateral Management Agreement"). In such capacity, PEMG shall be responsible for working with and advising the Trustee in connection with the acquisition by each of the Trusts of Replacement Policies and other investments, as applicable, in addition to its other responsibilities as manager of the Portfolio. In consideration therefor, the SPV shall pay PEMG a quarterly management fee of $937,500 (the "Management Fee").

1.6   Warrants. In consideration for PEMG's arranging the Transactions, not later than 10 days following the date Strategy shall have procured the Credit Default

-5-

Insurance Policies, Strategy shall issue to PEMG the following: (i) warrants, exercisable at any time during the three-year period following the issuance thereof, to acquire up to 13,800,000 voting common shares of Strategy, with an exercise price of $1.69 per share (the "3 Year Warrants"); and (ii) warrants, exercisable at any time during the five-year period following the issuance thereof, to acquire up to 13,800,000 voting common shares of Strategy, with an exercise price of, initially, $2.25 per share and increasing ratably, on a quarterly basis, after the third anniversary of the issuance of such warrants, in an amount of $0.125 per quarter, to a maximum of $3.25 per share (the "5 Year Warrants", and together with the 3 Year Warrants, the "Warrants"). The Warrants shall not be transferable, other than to an entity controlled by or affiliated with PEMG. The Warrants shall be subject to antidilution protection only in the event of a recapitalization, stock split, merger or similar event (i.e. not in the event of an issuance of securities of Strategy), but shall not have "full ratchet rights" with respect to antidilution. PEMG shall have demand registration rights with respect to stock issued upon exercise of the Warrants, provided however, that (x) it may make no such demand during the one year period following the registration by Strategy of certain stock to be issued in connection with certain outstanding warrants or equity of Strategy issued in connection with a transaction with Strategy Real Estate Investment, Inc. (the "SREI Registration"), (y) PEMG shall have no right to demand a registration with respect to less than 3,000,000 shares, and (z) PEMG shall have no right to demand a registration more frequently than every six months. In addition, PEMG shall have customary piggyback rights, other than with respect to the SREI Registration.

1.7 Waterfall. Pursuant to the Transactions, the parties agree that the waterfall of revenue (the "Relevant Revenue") earned by Insurance and derived from all revenue associated with the expanded underwriting capacity from the statutory capital provided by the Portfolio is as follows:

> (i) 25% of the Relevant Revenue, after deducting (x) the Dividend Obligation, (y) the Management Fee, and (z) taxes payable with respect to the Relevant Revenue (such remainder, the "Net Revenue") shall be paid to Strategy; and

> (ii) the remainder of the Net Revenue shall be paid 50% to PEMG (as consideration for its activities with respect to the advisory role in connection with proprietary underwriting and risk management processes, pursuant to an agreement (the "PEMG Management Agreement") and 50% to Strategy.

1.8 LG. Holdings and PEMG shall create an offshore entity to be known as Laurion Guarantee ("LG") in a mutually tax advantageous jurisdiction, the supermajority voting equity of which shall be held 50% each by Holdings and PEMG. The purpose of LG shall be primarily to write multiline insurance and reinsurance. It is presently contemplated that Holdings will cause LG to be capitalized with a letter of credit of approximately $25,000,000 (which it is currently anticipated may be obtained by SPV and thereafter loaned to Holdings for contribution to LG). Holdings and PEMG agree

-6-

that LG shall be co-managed by Holdings and PEMG on a 50/50 basis pursuant to usual and customary terms regarding the management and control of a 50/50 owned or controlled entity, in accordance with an agreement to be entered into between Holdings and PEMG (the "LG Shareholders Agreement").

## 2. PRECONDITIONS TO CLOSING OF THE TRANSACTIONS

The obligation of the parties to consummate the Transactions is subject to, among other things, the following:

2.1 (a) Strategy shall have had the opportunity to review, in accordance with Health Insurance Portability and Accountability Act of 1996, true and complete copies of the Initial Policies and the same shall be reasonably acceptable thereto, and Strategy shall have had the opportunity to review true and complete copies of such other documents and instruments (including, without limitation, the Trust Agreements and the related documents) that relate to any provisions or consideration given in this Letter Agreement and the same shall be reasonably acceptable thereto, and Strategy shall have had the opportunity to perform such other due diligence on the other parties hereto and the relevant affiliates thereof with respect to the Transactions as shall have been reasonably requested thereby.

(b) PEMG shall have had the opportunity to review true and complete copies of the financial and corporate books and records of Strategy and of each of the other Strategy parties hereto and the same shall be reasonably acceptable thereto, shall have had the opportunity to review true and complete copies of such other related documents and instruments that relate to any provisions or consideration given in this Letter Agreement (including, without limitation, the Transactions, other transactions or commitments, financials, and insurance issued or obtained) and the same shall be reasonably acceptable thereto, and PEMG shall have had the opportunity to perform such other due diligence on the other parties hereto and the relevant affiliates thereof with respect to the Transactions as shall have been reasonably requested thereby.

2.2 The execution and delivery by each of the parties, as relevant, of the various documents and instruments required to effect the same (the "Definitive Agreements"), each of which shall, as relevant, contain the terms and conditions set forth in this Letter Agreement, as well as other terms and conditions not inconsistent with this Letter Agreement, including without limitation, applicable representations, warranties, indemnities, deliveries of legal opinions and other preconditions to closing, defaults and other customary provisions for a transaction such as contemplated herein, including, such Definitive Agreements, which shall include, without limitation, the following:

Master Investment Agreement
Collateral Management Agreement
Warrant Agreements
Preferred Stock Certificate of Designation or similar

which shall be completed on or before October 15, 2005. On or before January 16, 2006 additional documents will be completed and shall include the following:

PEMG Management Agreement
SPV Management and Operating Agreement
LG Shareholders Agreement
Registration Rights Agreement

Each party hereby covenants and agrees to act in good faith to complete the Definitive Agreements, to execute and deliver on a timely basis the Definitive Agreements, and to take and cause to be taken such other action as may be required to document and consummate the Transactions.

    2.3    Obtaining the necessary consents or approvals of governmental bodies, insurance regulators, lenders, or other third parties on terms mutually acceptable to the parties including, if applicable, a condition that the waiting period under the Hart-Scott-Rodino Act shall have expired or been terminated without action by the Department of Justice ("DOJ").

## 3. TERMINATION OF THIS LETTER AGREEMENT; BREAK-UP FEE, PENALTY AGREEMENT

    3.1    Any of the parties hereto shall have the right not to proceed with the Transactions if, as a result of their due diligence, they reasonably believe that the Transactions cannot legally proceed as contemplated hereby and by the Definitive Agreements.

    3.2    This Letter Agreement shall terminate by its terms in the event that the Investment and primary documents relating thereto, including the Master Investment Agreement and the Collateral Management Agreement, are not consummated by October 15, 2005, provided that the parties agree that they may consummate the Investment by October 15, 2005 and thereafter continue to negotiate the other documents related to the Transactions (including, without limitation, documents relating to LG, the Warrant Agreements, etc.).

    3.3    If the Investment is not consummated by October 15, 2005, other than (i) as a result of a determination by GVEC or PEMG not to proceed with the same, or (ii) if GVEC or PEMG are not negotiating in good faith and in a commercially reasonable manner with respect to the Master Investment Agreement, and as a result thereof, the Master Investment Agreement cannot be completed in a reasonable time; or (iii) GVEC or PEMG shall have failed to satisfy the preconditions thereof as shall be agreed to in the Master Investment Agreement, then, in any other case, Strategy shall pay to PEMG a break-up fee (the "Break-Up Fee") of $2,000,000, and such break-up fee shall be the sole remedy of PEMG and GVEC with respect to the failure to so consummate the Investment.

-8-

NYCDMS/446012.9

3.4   If the Investment shall have been consummated on or prior to October 15, 2005, but Strategy shall not have procured the Credit Default Insurance Policies or the Portfolio Insurance (collectively, the "Required Policies") by January 15, 2006, then Strategy shall pay to PEMG a penalty payment (the "Penalty Payment") of $5,812,500, and such Penalty, together with the foreclosure thereby on the Common Stock as provided in Section 1.3 (d) above, shall be the sole remedies of PEMG and GVEC with respect to the failure to so obtain the Required Policies and with respect to the Transactions in general and, without limitation, the parties' failure thereafter to consummate the remainder of the Transactions, and if and upon such event, the Transactions and the Definitive Agreements shall be deemed terminated and of no force and effect, and no party hereto shall have any further obligation or liability to any other party hereto under the Definitive Agreements or with respect to the Transactions.

## 4.   MISCELLANEOUS

4.1   It is understood that this Letter Agreement does not contain all matters upon which agreement must be reached in order for the Transactions to be consummated, but is intended solely as an outline of certain material provisions. As stated above, the parties agree to act in good faith in the negotiation and execution and delivery of the Definitive Agreements and the consummation of the Transactions.

4.2   This Letter Agreement will be governed by the laws of the State of New York, without regard to conflicts of law rules of such State which would result in the application of the laws of another jurisdiction.

4.3   Except as and to the extent required by law, no party hereto will make, directly or indirectly, any public comment, statement, or communication with respect to, or otherwise to disclose or to permit the disclosure of the existence of discussions regarding a possible transaction between the parties or any of the terms, conditions, or other aspects of the Transactions proposed in this Letter Agreement, without the prior written consent of the other parties. The parties acknowledge that they have entered into a confidentiality agreement, which shall remain effective and not be superseded by this Letter Agreement.

4.4   Each of the parties hereto will be responsible for and bear all of its own costs and expenses (including any broker's or finder's fees and the expenses of its representatives) incurred at any time in connection with the Transactions, provided, however, that in the event that the Transactions are consummated, Strategy shall pay up to $150,000 of the legal fees of counsel to PEMG, in the event that such counsel shall have prepared any of the Definitive Agreements.

4.5   During the period from the execution by all parties of this Letter Agreement until the execution and delivery of the Definitive Agreements, the parties shall negotiate and otherwise act diligently, timely and in good faith to enter into Definitive Agreements.

NYCDMS/446012.9

4.6     The failure of any party to observe or perform any term, covenant or agreement contained in this Letter Agreement shall constitute an Event of Default hereunder. Upon the occurrence of an Event of Default, the nondefaulting party shall have all remedies, at law and equity, as are available to it, all such remedies which shall be cumulative, provided, however, that if PEMG shall be paid the Break-Up Fee (and, if applicable, has the right to exercise the Stock Foreclosure), the same shall constitute the sole remedies of PEMG and GVEC.

4.7     This Letter Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Letter Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

NYCDMS/446012.9

Sep 15 2005 9:31AM   HP LASERJET FAX                                         p.13
SENT BY: RS GROUP;                4163914880 ;        SEP-14-05 21:48;      PAGE 12/13

If the terms of this Letter Agreement are acceptable, please sign and return a copy of the same. Upon acceptance of this proposal by all parties, the same shall be deemed binding upon you.

Strategy International Insurance Group, Inc.

By: _____
Name: _Louis E. Lother_
Title: _Chief Financial Officer_

Strategy Holding Company Limited

By: _____
Name: _STEPHEN F. STONEHILL_
Title: _CEO_

Strategy Insurance Limited

By: _____
Name: _____
Title: _____

AGREED TO AND ACCEPTED BY:

Genesis Voyager Equity Corporation

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

Private Equity Management Group, Inc.

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

NYCDMS/446012.9

Sep 15 2005 9:32AM   HP LASERJET FAX                                                              p.14
SENT BY: RS GROUP;                    4163914860 ;         SEP-14-05 21:48;        PAGE 13/13
                                                               246 425 6616     P:01

If the terms of this Letter Agreement are acceptable, please sign and return a copy of the same. Upon acceptance of this proposal by all parties, the same shall be deemed binding upon you.

Strategy International Insurance Group, Inc.

By: _____
Name: _____
Title: _____

Strategy Holding Company Limited

By: _____
Name: _____
Title: _____

Strategy Insurance Limited

By: *[signature]*
Name: LENNOX GIBBS
Title: MANAGING DIRECTOR

**AGREED TO AND ACCEPTED BY:**

Genesis Voyager Equity Corporation

By: *[signature]*
Name: QUINY PANG
Title: Ex. Managing Director for ER&L
          Advisor for GVEC

By: _____
Name: _____
Title: _____

Private Equity Management Group, Inc.

By: *[signature]*
Name: NASAR ABOUBAKARE
Title: MANAGING DIRECTOR

By: *[signature]*
Name: QUINY PANG
Title: Ex. Managing Director L

-11-

NYCDMS/442012.5

STRATEGY INTERNATIONAL INSURANCE GROUP, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

OCTOBER 31, 2005 AND 2004
(Continued)

9.  CONTINGENCIES

Litigation

HH Hairspray, LLC ("Hairspray") sued us, in June 2005, in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach, Florida, for breach of contract relating to a Loan, Security and Pledge Agreement (the "Loan Agreement"), dated as of March 31, 2005, between Hairspray, LLC and Strategy Resort Financing, Inc. ("Strategy Finance") one of our subsidiaries. Strategy Finance and SIL, another one of our subsidiaries, are also named in the lawsuit. The complaint alleges that Strategy Finance breached an implied representation that it had the financial capability to fund $6,900,000 to Hairspray, as called for by the Loan Agreement, and that we allowed Strategy Finance to so represent. In the complaint, Hairspray alleges that the full amount was not received and demands judgment for damages, costs and fees and specific performance.

John Lepire and Ludger Limited, LLC (together, the "Plaintiffs") initially sued a number of defendants, including, one of the brokers we work with namely Aon Corporation, without naming our company as a defendant, in the Superior Court of California, County of Los Angeles, in July 2004. In March 2005 the Plaintiffs filed an amendment to their original complaint identifying our company as a defendant. That complaint includes causes of action for unfair competition, wrongful termination, conversion, fraud, breach of contract, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty, negligent misrepresentation, intentional misrepresentation, misappropriation of trade secrets and injunctive relief. The Plaintiffs allege that they created an insurance product called "SafeLease" and that the defendants infringed the rights of the Plaintiffs in that product through sales and marketing of products that Plaintiffs consider substantially similar or identical to SafeLease. The complaint seeks injunctive relief and unspecified monetary damages. This case is currently in its discovery phase. A trial date has not yet been set for this case. We intend to vigorously defend the allegations made in this complaint. Our management believes that the Plaintiff's allegations are without merit.

There is no other pending litigation or other material claims or actions that we are aware of.

10. OTHER MATTERS

The September 15, 2005 transaction described in the Form 10-QSB filed for the quarter ended July 31, 2005 between the Private Equity Management Group, Inc., Genesis Voyager Equity Corporation and the Company was not consummated by October 15, 2005 by mutual agreement and the breakup fee of $2,000,000 was not payable.

-15-


Exhibit 2

*SIGNATURES*

In accordance with the requirements of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

*STRATEGY INTERNATIONAL INSURANCE GROUP, INC.*

Date: December 15, 2005                     By: /s/ Steven Stonhill
                                                 _____
                                                 Name:  Steven Stonhill
                                                 Title: Chairman of the Board and Chief Executive Officer

Date: December 15, 2005                     By: /s/ Louis Lettieri
                                                 _____
                                                 Name:  Louis Lettieri
                                                 Title: Chief Financial Officer

—29—