INTERIM PLEDGE AGREEMENT

INTERIM PLEDGE AGREEMENT, dated as of January 26, 2006 ("Interim Pledge Agreement"), by and between Strategy International Insurance Group, Inc., a Texas corporation (the "Pledgor"), and GVEC Resource Inc., an international business corporation organized under the laws of the British Virgin Islands (the "Pledgee").

R E C I T A L S

A.     Strategy Investments LLC ("SILLC") and Pledgee are parties to that certain Loan Agreement, dated of even date herewith ("Loan Agreement"), and other related documents (collectively referred to as the "Loan Documents").

B.     Pledgor guarantees the payments and performance of SILLC under the Loan Agreement and the Loan Documents.

C.     SILLC under the Loan Agreement is obligated to provide a financial guarantee in the amount of US$31,900,000, to support a payment bond or insurance policy, from a provider rated not less than "A" ("Financial Guarantee").

D.     Pledgor and SILLC desire to secure the Obligation (as defined below) until the Financial Guarantee is obtained.

E.     Pledgor is both the parent company of SILLC and the holder of one hundred percent (100%) of the membership interest in SILLC ("Member Interest").

F.     The Pledgor, as owner of the Member Interest and parent company of SILLC, shall derive benefit from the Loan Agreement and has therefore agreed to make an interim pledge all of its Member Interest to the Pledgee, upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, for and in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Pledgor and the Pledgee hereby agree as follows:

1.     Defined Terms; Construction.

(a)     Unless otherwise defined herein, all terms defined in Article 8 and Article 9 of the Uniform Commercial Code in effect as of the date hereof in the State of Nevada are used herein as defined therein.

(b)     The words "hereby," "hereof," "herein" and "hereunder" and words of like import when used in this Interim Pledge Agreement shall refer to this Interim Pledge Agreement as a whole and not to any particular provision of this Interim Pledge Agreement. Section references herein are to this Interim Pledge Agreement unless otherwise specified.

GVECR        SILLC        SIIG

Exhibit 15   Blumberg No. 6137

(c)     All terms defined in this Interim Pledge Agreement in the singular shall have comparable meanings when used in the plural, and *vice versa*, unless otherwise specified.

2.     Pledge.  SILLC shall obtain the Financial Guarantee on or before May 31, 2006.  As collateral security until the Financial Guarantee is obtained by SILLC for the re-payment of the Loan Agreement by SILLC and which Loan Agreement is guaranteed by Pledgor (the "Obligation"), the Pledgor hereby pledges, assigns and grants to the Pledgee a first priority security interest in and to the Member Interest, together with all additional membership interests in SILLC acquired by the Pledgor after the date hereof ("Additional Member Interest"), and the certificates, if any,  representing Member Interest and Additional Member Interest ("Pledged Member Interest").  Simultaneously herewith, the Pledgor is delivering to Private Equity Management Group, Inc., the stakeholder for the Pledgee ("Stake Holder") the certificates, if any, representing the Member Interest, together with Member Interest powers, duly executed in blank. The Pledgor will deliver to the Pledgee the certificates, if any, representing any Additional Member Interest, together with Additional Member Interest powers, duly executed in blank, once acquired by Pledgor.

3.     <u>Pledgee Rights Regarding Pledged Member Interest</u>.   Until this Interim Pledge Agreement terminates, the Pledgee may, upon the failure of SILLC or Pledgor to fulfill the Obligation or on the occurrence of an Event of Default as that term is defined in the Loan Agreement and the Loan Documents ("Event of Default"), at its option, upon prior written notice to the Pledgor, transfer or register the Pledged Member Interest (in whole, but not in part) into its or its nominee's name without any indication that such Pledged Member Interest is subject to the security interest hereunder, and the Pledgor will cause SILLC to cooperate with the Pledgee in effecting any such transfer or registration with no objection.

4.     <u>Representations and Warranties</u>.   The Pledgor represents and warrants as follows:

(a)     It is the sole legal and beneficial owner of the Member Interest, free and clear of any lien except for the security interest created by this Interim Pledge Agreement and the Management Fee Pledge Agreement of even date, which is subordinate only to this Interim Pledge Agreement.  The Pledged Member Interest constitutes 100% of the issued and outstanding membership interest in SILLC.

(b)     It has full corporate power to execute, deliver and perform this Interim Pledge Agreement.  Such execution, delivery and performance have been duly authorized and do not violate any of the Pledgor's charter documents, any applicable law, rule, negotiation or court order or any contract or agreement binding on the Pledgor or its property.

(c)     There are no restrictions on the voting rights associated with any of the Pledged Member Interest, other than pursuant to this Interim Pledge Agreement, the Management Fee Pledge Agreement, or as set forth in the Loan Agreement and the Loan Documents and as may be set forth in a membership agreement of SILLC, to which the Pledgee shall be a party.

GVECR       SILLC       SIIG

(d)    Except for such action as shall be required to be taken by the Pledgee to perfect its interest in the Pledged Member Interest, no authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required either (i) for the pledge of the Pledged Member Interest pursuant to this Interim Pledge Agreement or (ii) for the execution, delivery or performance of this Interim Pledge Agreement by the Pledgor. The pledge of the Pledged Member Interest pursuant to this Interim Pledge Agreement creates a valid and perfected first priority security interest in the Pledged Member Interest, in favor of the Pledgee securing the performance of the Obligation.

5.    <u>Distributions; Voting Rights</u>.    Unless an Event of Default shall have occurred and be continuing, the Pledgor shall be permitted to receive all cash distributions paid in the normal course of business of SILLC and consistent with past practice, to the extent permitted in the Management Agreement and the Management Fee Pledge Agreement, in respect of the Pledged Member Interest and, except as otherwise agreed among the parties pursuant to the Loan Agreement and the Loan Documents, to exercise all voting and company rights with respect to the Pledged Member Interest; <u>provided</u>, <u>however</u>, that no vote shall be cast or company right exercised or other action taken which, in the Pledgee's reasonable judgment, would impair the Pledged Member Interest or which would be inconsistent with or result in any violation of any provision of the Loan Agreement and the Loan Documents, this Interim Pledge Agreement, the Management Fee Pledge Agreement, or any other document or instrument related to the foregoing or the transactions contemplated thereby and to which Pledgee has not consented in its sole discretion in writing.

6.    <u>Transfers and Other Liens</u>.    The Pledgor agrees that it will not create any lien upon or with respect to any of the Pledged Member Interest, except for the security interest under this Interim Pledge Agreement and the Management Fee Pledge Agreement, not permit any other obligation on SILLC except to which Pledgee has consented in its sole discretion in writing.

7.    <u>Additional Security.</u>    As additional security Pledgee and SILLC shall permit and cooperate the filing of UCC Statements in Florida and Texas, and such other jurisdictions as requested by Pledgee.

8.    <u>Remedies; Application of Proceeds.</u>

(a)    Until this Interim Pledge Agreement terminates, if an Event of Default shall have occurred and be continuing, without any further action required thereby, the Pledgee may, upon prior written notice to the Pledgor, transfer the Pledged Member Interest and the Additional Member Interest into the name of the Pledgee or a designee thereof, and the Pledgee or such designee shall thereafter have ownership of the Pledged Member Interest and the Additional Member Interest, as the case may be, together with all rights, including voting rights, appurtenant thereto.

(b)    The parties hereto hereby confirm and agree that the transfer of the Pledged Member Interest to the name of the Pledgee or a designee pursuant to this Section shall be full satisfaction of this Obligation.

GVECR          SILLC          SIIG

9.     Termination of this Interim Pledge Agreement; Release of Pledged Member Interest.  The pledge made and the security interest granted by the Pledgor under this Interim Pledge Agreement shall terminate upon the establishment of the Financial Guarantee.  Upon such termination the Pledgee shall promptly cooperate to have the Stake Holder, subject only to the terms of the Management Fee Pledge Agreement, execute and deliver to the Pledgor the certificates, if any,  evidencing the Pledged Member Interest and the accompanying Member Interest and Additional Member Interest powers, together with such instruments, documents and agreements as are reasonably necessary or reasonably desirable to terminate the Pledgee's security interest in the Pledged Member Interest.  However, should the Member Interest and Additional Member Interest be transferred to Pledgee in accordance with Paragraph 8(a), then such transferred interest shall remain and there will not be a return of the Member Interest and Additional Member Interest to Pledgor.

10.     Successors and Assigns.  This Interim Pledge Agreement shall be binding upon the parties and their successors and assigns in accordance with the Loan Agreement. Nothing set forth herein is intended or shall be construed to give any other person any right, remedy or claim under, to or in respect of this Interim Pledge Agreement or any Pledged Member Interest.

11.     Applicable Law.  This Interim Pledge Agreement shall be interpreted, and the rights and liabilities of the parties hereto determined, in accordance with the internal laws of the State of Nevada, without regard to conflicts of law.

12.     Consent to Jurisdiction and Service of Process. The Pledgor and the Pledgee agree that the terms of the Loan Agreement with respect to consent to jurisdiction and service of process shall apply equally to this Interim Pledge Agreement.

13.     Waiver Of Jury Trial.  The Pledgor and the Pledgee waive any right to trial by jury in any action, proceeding or dispute, whether sounding in contract, tort, or otherwise, between the Pledgee and the Pledgor arising out of, or related to, the transactions contemplated by this Interim Pledge Agreement or any other instrument, document or agreement executed or delivered in connection herewith.  The Pledgor or the Pledgee may file an original counterpart or a copy of this Interim Pledge Agreement with any court as written evidence of the consent of the parties hereto to the waiver of their right to trial by jury.

14.     Severability.  Whenever possible, each provision of this Interim Pledge Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but, if any provision of this Interim Pledge Agreement shall be held to be prohibited or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Interim Pledge Agreement.

15.     Further Assurances.  The parties hereto agree to cooperate and will execute and deliver, or cause to be executed and delivered, all such other Member Interest and Additional Member Interest powers, proxies, instruments and documents as may be reasonably requested from time to time in order to carry out the provisions and purposes of this Interim Pledge Agreement.

2006-01-26                          Page 4 of 5

GVECR        SILLC        SIIG

16.    <u>Notices</u>.  All notices and other communications required or desired to be served, given or delivered hereunder shall be in writing and shall be served, given or delivered as provided with respect to the Pledgor and the Pledgee in the Loan Agreement.

17.    <u>Amendments, Waivers and Consents</u>.  None of the terms or provisions of this Interim Pledge Agreement may be waived, altered, modified or amended, and no consent to any departure by a party hereto herefrom shall be effective, except by or pursuant to an instrument in writing which is duly executed by the Pledgor and the Pledgee.  Any such waiver shall be valid only to the extent set forth therein.  No failure to exercise or delay in exercising any right, power or privilege under this Interim Pledge Agreement shall operate as a waiver thereof; and no single or partial exercise of any right, power or privilege under this Interim Pledge Agreement shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

18.    <u>Section Titles</u>.  The section titles herein are for convenience of reference only, and shall not affect in any way the interpretation of any of the provisions hereof.

19.    <u>Execution in Counterparts</u>.  This Interim Pledge Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the Pledgor and the Pledgee have executed this Interim Pledge Agreement as of the date set forth above.

STRATEGY INTERNATIONAL INSURANCE GROUP, INC.

By: _____
Name: Stephen J. Stonhill
Title: President

By: _____
Name: Sandro Sordi
Title: Authorized Signatory


GVEC RESOURCE INC.

By: _____
Name: Nasar Aboubakare
Title: Director

By: _____
Name: Robert Anderson
Title: Director

2006-01-26                          Page 5 of 5                    GVECR    SIILC    SIIG

## ESCROW AGREEMENT

ESCROW AGREEMENT dated as of April 4, 2006 ("Agreement") by and among Strategy Investments LLC, a Florida limited liability company ("SILLC"), Strategy Resort Financing, Inc., an Ontario registered company ("SRFI"), Strategy International Insurance Group, Inc., a Texas corporation ("SIIG", and SILLC, SRFI and SIIG collectively the "Strategy Parties"), John Hamilton, an individual ("Hamilton"), Michael Kelly, an individual ("Kelly"), GVEC Resource Inc., an international business company organized under the laws of the British Virgin Islands ("GVECR"), Private Equity Management Group, Inc., a Nevada corporation ("PEMG"), and Baker & McKenzie LLP, as escrow agent (the "Escrow Agent").

### RECITALS

WHEREAS SILLC is obligated to provide an acceptable payment bond ("Payment Bond") secured by a reinsurer obligated to pay on the payment bond rated A or better by A.M. Best, Standard and Poor's, Moody's, or Fitch in the amount of US$31,900,000 in favor of GVECR ("Reinsurance");

WHEREAS, Hamilton and Kelly have agreed to pay the premium for the Payment Bond and the Reinsurance;

WHEREAS, GVECR has agreed to reimburse Hamilton and Kelly upon receipt of the Payment Bond and the Reinsurance in good order and authorized form;

WHEREAS, Baker & McKenzie LLP has agreed to provide an opinion letter in form and substance acceptable to GVECR and PEMG;

WHEREAS, the Strategy Parties, Hamilton, Kelly, GVECR and PEMG desire to have an escrow established to handle the funds and documents necessary to close the transactions contemplated by the foregoing paragraphs; and

WHEREAS, the Strategy Entities, Hamilton, Kelly, GVECR and PEMG desire to have Escrow Agent serve as escrow agent and Escrow Agent is willing to serve as the escrow agent hereunder, pursuant to the terms and provisions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and of the covenants and agreements contained herein, and other good and valuable consideration, the receipt and legal adequacy of which the parties hereby acknowledge and agree to be legally bound thereby, the parties agree as follows:

1. <u>Escrow.</u>

(a)    Upon the Escrow Agent's receipt, subject to Section 1(b), of up to Two Million Seven Hundred Forty One Thousand Two Hundred Fifty United States

SILLC  SRFI  SIIG  GVECR  PEMG

Exhibit 16

Dollars ($2,741,250) (the "Escrowed Amount"), by wire transfer of immediately available funds to the bank account of the Escrow Agent specified on Schedule 1 attached hereto, Escrow Agent will hold the Escrowed Amount, or any portion thereof, pending disbursement of the Escrowed Amount as provided in Section 2 hereof or return such Escrowed Amount to GVECR no later than May 31, 2006, in accordance with the terms and conditions of this Agreement.

(b)     The Escrowed Amount may be wired into Escrow in multiple payments, at the sole discretion of GVECR. However, disbursements from Escrow will only be made if there are sufficient funds available. Should the funds not be sufficient for a disbursement, then Escrow Agent shall request GVECR to wire the necessary funds no later than three (3) business days after receipt of request from Escrow Agent.

(c)     Upon Escrow Agent's receipt of the documents listed below in Section 2 acceptable to GVECR (the "Documents"), the Escrow Agent will disburse the Escrowed Amount to Hamilton and Kelly, as directed by Hamilton, Kelly, and the Strategy Entities ("Directions"). In the event Escrow Agent does not receive the Directions, Escrow Agent will hold the Escrowed Amount for the benefit of Hamilton and Kelly at the sole cost to Hamilton, Kelly, and the Strategy Entities.

(d)     Simultaneously with the disbursement provided for in Section 1(c) Escrow Agent shall deliver the Documents to GVECR whether or not Escrow Agent has received the Directions.

(e)     The Escrowed Amount will not bear interest. The Escrowed Amount shall be held in the Escrow Agent's segregated IOLA trust account for the benefit of GVECR until the provisions of Section 1(c) come into effect and thereafter for the benefit of Hamilton and Kelly in accordance with New York law.

2.     Release from Escrow.

(a)     Escrow Agent upon receipt of all of the Documents specified in Section 2(b) in the form attached hereto, except as waived by GVECR and PEMG,  will make the disbursement of the Escrowed Amount as provided in Section 1(c):

(b)     Documents

(i)     Payment Bond from Builder's and Contractor's Assurance Co., Ltd. ("Builders") (original duly authorized and signed);

(ii)     Reinsurance Cover Attachment (original duly authorized and signed);

(iii)     Opinion Letter of Baker & McKenzie LLP (in the form attached hereto as Exhibit A, final and signed);

2006-01-19                              Page 2 of 8

SILLC     SRFI   SIIG   GVECR   PEMG   B&M

      **(iv)**    Letter from London Broker confirming placement of Payment Bond with reinsurer under the appropriate treaties (original duly authorized and signed)

      **(v)**    Placement Slip confirming and showing coverage and acceptance by named reinsurer of the Payment Bond executed by the London Broker with a Power of Attorney attached (original all duly authorized and signed).

    (c)    Delivery of Documents.  Escrow Agent shall deliver the Documents listed in Section 2(b) to GVECR at the following address:

> GVEC Resource Inc.
> c/o Equity Resource Management Ltd.
> One Park Plaza, Suite 550
> Irvine, California 92614-2594
> United States of America

3.    Prior Representation.  GVECR and PEMG acknowledge that from time to time the Escrow Agent has and may serve as legal counsel to the Strategy Parties and/or to Builder's and that by virtue of serving as Escrow Agent hereunder GVECR and PEMG shall not object to the Escrow Agent's legal representation of any of the Strategy Parties or Builder's in any matter (including, without limitation, in any litigation or arbitration proceeding).

4.    Resignation of Escrow Agent.  The Escrow Agent may resign at any time, in its sole discretion, and whereupon the Escrow Agent shall be discharged from its duties or obligations hereunder upon giving notice in writing to the other parties hereto of such resignation not less than twenty-five (25) days prior to when said resignation is to take effect.  In the event of such resignation, a successor shall be designated by the parties on or prior to the effectiveness thereof, and if a successor is not so designated, this Agreement shall terminate upon the date of the effectiveness of the Escrow Agent's resignation.

5.    Interpleader Action.  Notwithstanding anything set forth in this Agreement, if at any time there is a dispute among the parties hereto (other then the Escrow Agent) or the Escrow Agent, in its sole discretion, is uncertain as to its obligations hereunder, the Escrow Agent shall be entitled to commence an interpleader action or other similar action in any of the courts specified in Section 7(b) hereof, and concurrently therewith, the Escrow Agent shall deposit with such court the Escrowed Amount then in its possession and the Documents then in its possession.  Upon the commencement of any such action, the court may, on motion, order the Escrow Agent to be relieved of its obligations hereunder.

6.     Duties of Escrow Agent.

(a)     The duties and obligations of the Escrow Agent shall be determined solely by this Agreement, and the Escrow Agent shall not have any duties except for the performance of such duties and obligations as are specifically set forth herein. In the event that any of the terms and provisions of any other agreement between any of the parties hereto conflict or are inconsistent with any of the terms and provisions of this Agreement, the terms and provisions of this Agreement shall govern and control in all respects this escrow. The Escrow Agent shall not be subject to, nor be under any obligation to inquire as to the form, execution, sufficiency, or validity of any such instrument nor to inquire as to the identity, authority, or rights of the person or persons executing or delivering same.

(b)     The Escrow Agent will receive the Documents from the parties executing and authorizing the same.

(c)     In the performance of its duties hereunder, the Escrow Agent shall be entitled to rely upon any document, instrument or signature believed by it in good faith to be genuine and signed by any party thereto or an authorized officer or agent thereof, and shall not be required to investigate the truth or accuracy of any statement contained in any such document or instrument. The Escrow Agent may assume that any person purporting to give any notice in accordance with the provisions of this Agreement has been duly authorized to do so.

(d)     The Escrow Agent shall not be liable for any error of judgment, or any action taken, suffered or omitted to be taken, hereunder, except in the case of its gross negligence, bad faith or willful misconduct or failure to comply with the terms of this Escrow Agreement. Any act done or omitted to be done by the Escrow Agent pursuant to the advice of its attorneys (which may be lawyers at Baker & McKenzie LLP) shall be deemed conclusively to have been performed or omitted in good faith by the Escrow Agent.

(e)     The Escrow Agent shall have no duty as to the collection or protection of the Escrowed Amount, or as to the preservation of any rights pertaining thereto, beyond depositing such funds in the trust account set up for the benefit of GVECR at an institution acceptable to PEMG, as designated in writing by PEMG.

(f)     Each of the parties hereto (other than the Escrow Agent) hereby agrees, jointly and severally, to indemnify and hold the Escrow Agent, and its partners, employees, and agents, harmless from and against any and all costs, damages, judgments, liabilities, obligations and expenses (including, without limitation, attorneys' fees) of every kind and nature which the Escrow Agent, and/or any of its directors, officers, employees, and agents, may incur, sustain, or be required to pay in connection with or arising out of this Agreement, unless the aforementioned results from the Escrow Agent's gross negligence, bad faith or willful misconduct, and to pay the Escrow Agent on demand the amount of all such reasonable costs, damages,

2006-01-19                          Page 4 of 8

SILLC   SRFI   SIIG   GVECR   PEMG   B&M

judgments, liabilities, obligations and expenses. The reasonable costs and expenses of enforcing this right of indemnification also shall be paid by the Strategy Parties. The foregoing indemnities in this paragraph shall survive the resignation or substitution of the Escrow Agent or the termination of this Agreement.

(g)     The Strategy Parties, including Hamilton and Kelly, and GVECR shall each be responsible for reimbursing the Escrow Agent for fifty percent (50%) of the expenses incurred by the Escrow Agent in performing its duties hereunder.

7.     Governing Law; Jurisdiction.

(a)     This Agreement shall be governed by, and construed in accordance with, the laws of the state of New York applicable to contracts executed and to be performed entirely within that State, without reference to any of New York's conflicts of law principles that could result in the application of the laws of another jurisdiction.

(b)     Each of the parties hereto (i) consents to the exclusive jurisdiction or the courts of the State of New York located in Borough of Manhattan and the Federal District Court for the Southern District of New York, in connection with any disputes, claims or controversies regarding this Agreement (including, without limitation, the rights and obligations of the Escrow Agent hereunder), (ii) agrees that process may be served upon such party pursuant to any the rules of such Court; and (iii) waives any right to claim that venue in such Courts is not proper or that such Courts constitute an incorrect forum.

8.     Amendment; Waiver.   This Agreement may not be amended or modified except by an instrument in writing signed by each of the parties and the Escrow Agent.   The failure of any party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

9.     Entire Agreement.   This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior and/or contemporaneous agreements and undertakings, both written and oral, among the parties with respect to the subject matter hereof, all of which are merged herein.

10.     Assignment No Third Party Beneficiaries.   This Agreement may not be assigned by operation of law or otherwise without the express written consent of GVECR, the Strategy Parties and the Escrow Agent.   This Agreement shall be binding upon and inure solely to the benefit of the parties hereto, the Noteholders of GVECR, and their permitted assigns. This Agreement is for the sole benefit of the parties hereto, the Noteholders of GVECR, and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

2006-01-19                          Page 5 of 8

SFELC   SKFI   SIIG   GVECR   PEMG   B&M

11.   Headings.  The descriptive headings contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning, construction or interpretation of this Agreement.

12.   Counterparts.  This Agreement may be executed in any number of counterparts each of which shall be an original and all of which taken together shall constitute one and the same instrument.   In making proof of this Escrow Agreement it shall be necessary to produce or account for one such counterpart signed by or on behalf of the party sought to be charged herewith.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

STRATEGY INVESTMENTS, LLC

By: _____
    Sandro Sordi
    Managing Member

STRATEGY RESORT FINANCING, INC.

By: _____
    Sandro Sordi
    President

STRATEGY INTERNATIONAL INSURANCE GROUP, INC.

By: _____
    Stephen Stonhill
    Chief Executive Officer

GVEC RESOURCE INC.

By: _____        By: _____
    Robert Anderson                    Todd Gillespie
    Director                           Authorized Signatory

2006-01-19                    Page 6 of 8

SILLC   SRFI   SIIG   GVECR   PEMG   B&M

**JOHN HAMILTON,**

By:_____
     Name: John Hamilton

**MICHAEL KELLY,**

By:_____
     Name: Michael Kelly

**BAKER & McKENZIE, LLP**
**as Escrow Agent**

By:_____
     Name:
     Title:

**PRIVATE EQUITY MANAGEMENT GROUP, INC.**

By:_____     By:_____
   Robert Anderson               Wil Quon
   Managing Director             Chief Financial Officer and Director

2006-01-19                     Page 7 of 8

SELC   SRFI   SIIG   GVECR   PEMG   B&M

SCHEDULE 1

Baker & McKenzie, LLP Escrow Account

Baker & McKenzie, City Bank, N.A.
Private Banking Division
153 53rd Street
20th Floor
New York, N.Y. 10043

Name of Account:    Baker & McKenzie LLP Attorney Trust IOLA
Account No:          37956006
Routing No:          021000089

## ESCROW AGREEMENT

ESCROW AGREEMENT dated as of April 4, 2006 ("Agreement") by and among Strategy Investments LLC, a Florida limited liability company ("SILLC"), Strategy Resort Financing, Inc., an Ontario registered company ("SRFI"), Strategy International Insurance Group, Inc., a Texas corporation ("SIIG", and SILLC, SRFI and SIIG collectively the "Strategy Parties"), John Hamilton, an individual ("Hamilton"), Michael Kelly, an individual ("Kelly"), GVEC Resource Inc., an international business company organized under the laws of the British Virgin Islands ("GVECR"), Private Equity Management Group, Inc., a Nevada corporation ("PEMG"), and Baker & McKenzie LLP, as escrow agent (the "Escrow Agent").

## RECITALS

WHEREAS SILLC is obligated to provide an acceptable payment bond ("Payment Bond") secured by a reinsurer obligated to pay on the payment bond rated A or better by A.M. Best, Standard and Poor's, Moody's, or Fitch in the amount of US$31,900,000 in favor of GVECR ("Reinsurance");

WHEREAS, Hamilton and Kelly have agreed to pay the premium for the Payment Bond and the Reinsurance;

WHEREAS, GVECR has agreed to reimburse Hamilton and Kelly upon receipt of the Payment Bond and the Reinsurance in good order and authorized form;

WHEREAS, Baker & McKenzie LLP has agreed to provide an opinion letter in form and substance acceptable to GVECR and PEMG;

WHEREAS, the Strategy Parties, Hamilton, Kelly, GVECR and PEMG desire to have an escrow established to handle the funds and documents necessary to close the transactions contemplated by the foregoing paragraphs; and

WHEREAS, the Strategy Entities, Hamilton, Kelly, GVECR and PEMG desire to have Escrow Agent serve as escrow agent and Escrow Agent is willing to serve as the escrow agent hereunder, pursuant to the terms and provisions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and of the covenants and agreements contained herein, and other good and valuable consideration, the receipt and legal adequacy of which the parties hereby acknowledge and agree to be legally bound thereby, the parties agree as follows:

1.   Escrow.

(a)   Upon the Escrow Agent's receipt, subject to Section 1(b), of up to Two Million Seven Forty One Thousand Two Hundred Fifty United States Dollars

($2,741,250) (the "Escrowed Amount"), by wire transfer of immediately available funds to the bank account of the Escrow Agent specified on Schedule 1 attached hereto, Escrow Agent will hold the Escrowed Amount, or any portion thereof, pending disbursement of the Escrowed Amount as provided in Section 2 hereof or return such Escrowed Amount to GVECR no later than May 31, 2006, in accordance with the terms and conditions of this Agreement.

(b)     The Escrowed Amount may be wired into Escrow in multiple payments, at the sole discretion of GVECR. However, disbursements from Escrow will only be made if there are sufficient funds available. Should the funds not be sufficient for a disbursement, then Escrow Agent shall request GVECR to wire the necessary funds no later than three (3) business days after receipt of request from Escrow Agent.

(c)     Upon Escrow Agent's receipt of the documents listed below in Section 2 acceptable to GVECR (the "Documents"), the Escrow Agent will disburse the Escrowed Amount to Hamilton and Kelly, as directed by Hamilton, Kelly, and the Strategy Entities ("Directions"). In the event Escrow Agent does not receive the Directions, Escrow Agent will hold the Escrowed Amount for the benefit of Hamilton and Kelly at the sole cost to Hamilton, Kelly, and the Strategy Entities.

(d)     Simultaneously with the disbursement provided for in Section 1(c) Escrow Agent shall deliver the Documents to GVECR whether or not Escrow Agent has received the Directions.

(e)     The Escrowed Amount will not bear interest. The Escrowed Amount shall be held in the Escrow Agent's segregated IOLA trust account for the benefit of GVECR until the provisions of Section 1(c) come into effect and thereafter for the benefit of Hamilton and Kelly in accordance with New York law.

2.     Release from Escrow.

(a)     Escrow Agent upon receipt of all of the Documents specified in Section 2(b) in the form attached hereto, except as waived by GVECR and PEMG, will make the disbursement of the Escrowed Amount as provided in Section 1(c):

(b)     Documents

(i)     Payment Bond from Builder's and Contractor's Assurance Co., Ltd. ("Builders") (original duly authorized and signed);

(ii)     Reinsurance Cover Attachment (original duly authorized and signed);

(iii)     Opinion Letter of Baker & McKenzie LLP (in the form attached hereto as Exhibit A, final and signed);

SILLC  SRFI  SIIG  GVECR  PEMG  B&M

        (iv)     Letter from London Broker confirming placement of Payment Bond with reinsurer under the appropriate treaties (original duly authorized and signed)

        (v)     Placement Slip confirming and showing coverage and acceptance by named reinsurer of the Payment Bond executed by the London Broker with a Power of Attorney attached (original all duly authorized and signed).

      (c)     Delivery of Documents. Escrow Agent shall deliver the Documents listed in Section 2(b) to GVECR at the following address:

> GVEC Resource Inc.
> c/o Equity Resource Management Ltd.
> One Park Plaza, Suite 550
> Irvine, California 92614-2594
> United States of America

3.    <u>Prior Representation</u>. GVECR and PEMG acknowledge that from time to time the Escrow Agent has and may serve as legal counsel to the Strategy Parties and/or to Builder's and that by virtue of serving as Escrow Agent hereunder GVECR and PEMG shall not object to the Escrow Agent's legal representation of any of the Strategy Parties or Builder's in any matter (including, without limitation, in any litigation or arbitration proceeding).

4.    <u>Resignation of Escrow Agent</u>. The Escrow Agent may resign at any time, in its sole discretion, and whereupon the Escrow Agent shall be discharged from its duties or obligations hereunder upon giving notice in writing to the other parties hereto of such resignation not less than twenty-five (25) days prior to when said resignation is to take effect. In the event of such resignation, a successor shall be designated by the parties on or prior to the effectiveness thereof, and if a successor is not so designated, this Agreement shall terminate upon the date of the effectiveness of the Escrow Agent's resignation.

5.    <u>Interpleader Action</u>. Notwithstanding anything set forth in this Agreement, if at any time there is a dispute among the parties hereto (other then the Escrow Agent) or the Escrow Agent, in its sole discretion, is uncertain as to its obligations hereunder, the Escrow Agent shall be entitled to commence an interpleader action or other similar action in any of the courts specified in Section 7(b) hereof, and concurrently therewith, the Escrow Agent shall deposit with such court the Escrowed Amount then in its possession and the Documents then in its possession. Upon the commencement of any such action, the court may, on motion, order the Escrow Agent to be relieved of its obligations hereunder.

SILLC  SRFI  SIIG  GVECR  PEMG  B&M

6.    Duties of Escrow Agent.

(a)    The duties and obligations of the Escrow Agent shall be determined solely by this Agreement, and the Escrow Agent shall not have any duties except for the performance of such duties and obligations as are specifically set forth herein. In the event that any of the terms and provisions of any other agreement between any of the parties hereto conflict or are inconsistent with any of the terms and provisions of this Agreement, the terms and provisions of this Agreement shall govern and control in all respects this escrow. The Escrow Agent shall not be subject to, nor be under any obligation to inquire as to the form, execution, sufficiency, or validity of any such instrument nor to inquire as to the identity, authority, or rights of the person or persons executing or delivering same.

(b)    The Escrow Agent will receive the Documents from the parties executing and authorizing the same.

(c)    In the performance of its duties hereunder, the Escrow Agent shall be entitled to rely upon any document, instrument or signature believed by it in good faith to be genuine and signed by any party thereto or an authorized officer or agent thereof, and shall not be required to investigate the truth or accuracy of any statement contained in any such document or instrument. The Escrow Agent may assume that any person purporting to give any notice in accordance with the provisions of this Agreement has been duly authorized to do so.

(d)    The Escrow Agent shall not be liable for any error of judgment, or any action taken, suffered or omitted to be taken, hereunder, except in the case of its gross negligence, bad faith or willful misconduct or failure to comply with the terms of this Escrow Agreement. Any act done or omitted to be done by the Escrow Agent pursuant to the advice of its attorneys (which may be lawyers at Baker & McKenzie LLP) shall be deemed conclusively to have been performed or omitted in good faith by the Escrow Agent.

(e)    The Escrow Agent shall have no duty as to the collection or protection of the Escrowed Amount, or as to the preservation of any rights pertaining thereto, beyond depositing such funds in the trust account set up for the benefit of GVECR at an institution acceptable to PEMG, as designated in writing by PEMG.

(f)    Each of the parties hereto (other than the Escrow Agent) hereby agrees, jointly and severally, to indemnify and hold the Escrow Agent, and its partners, employees, and agents, harmless from and against any and all costs, damages, judgments, liabilities, obligations and expenses (including, without limitation, attorneys' fees) of every kind and nature which the Escrow Agent, and/or any of its directors, officers, employees, and agents, may incur, sustain, or be required to pay in connection with or arising out of this Agreement, unless the aforementioned results from the Escrow Agent's gross negligence, bad faith or willful misconduct, and to pay the Escrow Agent on demand the amount of all such reasonable costs, damages,

SILLC   SRFI   SIIG   GVECR   PEMG   B&M

judgments, liabilities, obligations and expenses. The reasonable costs and expenses of enforcing this right of indemnification also shall be paid by the Strategy Parties. The foregoing indemnities in this paragraph shall survive the resignation or substitution of the Escrow Agent or the termination of this Agreement.

(g)     The Strategy Parties, including Hamilton and Kelly, and GVECR shall each be responsible for reimbursing the Escrow Agent for fifty percent (50%) of the expenses incurred by the Escrow Agent in performing its duties hereunder.

7.     <u>Governing Law; Jurisdiction</u>.

(a)     This Agreement shall be governed by, and construed in accordance with, the laws of the state of New York applicable to contracts executed and to be performed entirely within that State, without reference to any of New York's conflicts of law principles that could result in the application of the laws of another jurisdiction.

(b)     Each of the parties hereto (i) consents to the exclusive jurisdiction or the courts of the State of New York located in Borough of Manhattan and the Federal District Court for the Southern District of New York, in connection with any disputes, claims or controversies regarding this Agreement (including, without limitation, the rights and obligations of the Escrow Agent hereunder), (ii) agrees that process may be served upon such party pursuant to any the rules of such Court; and (iii) waives any right to claim that venue in such Courts is not proper or that such Courts constitute an incorrect forum.

8.     <u>Amendment; Waiver</u>.  This Agreement may not be amended or modified except by an instrument in writing signed by each of the parties and the Escrow Agent.  The failure of any party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

9.     <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior and/or contemporaneous agreements and undertakings, both written and oral, among the parties with respect to the subject matter hereof, all of which are merged herein.

10.     <u>Assignment No Third Party Beneficiaries</u>.  This Agreement may not be assigned by operation of law or otherwise without the express written consent of GVECR, the Strategy Parties and the Escrow Agent.  This Agreement shall be binding upon and inure solely to the benefit of the parties hereto, the Noteholders of GVECR, and their permitted assigns.  This Agreement is for the sole benefit of the parties hereto, the Noteholders of GVECR, and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SILLC  SRFI  SIIG  GVECR  PEMG  B&M

11.    <u>Headings</u>.  The descriptive headings contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning, construction or interpretation of this Agreement.

12.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts each of which shall be an original and all of which taken together shall constitute one and the same instrument.  In making proof of this Escrow Agreement it shall be necessary to produce or account for one such counterpart signed by or on behalf of the party sought to be charged herewith.

    IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**STRATEGY INVESTMENTS LLC**

By:_____
    Sandro Sordi
    President

**STRATEGY RESORT FINANCING, INC.**

By:_____
    Sandro Sordi
    President

**STRATEGY INTERNATIONAL INSURANCE GROUP, INC.**

By:_____
    John Stonehill
    President

**GVEC RESOURCE INC.**

By:_____          By:_____
    Robert Anderson                         Todd Gillespie
    Director                                       Authorized Signatory

JOHN HAMILTON,


By:_____
    Name: John Hamilton


MICHAEL KELLY,


By:_____
    Name: Michael Kelly


BAKER & McKENZIE LLP,
as Escrow Agent


By:_____
Name: Marlo Eric Wich
Title: Partner


PRIVATE EQUITY MANAGEMENT GROUP, INC.


By:_____    By:_____
    Robert Anderson                Wil Quon
    Managing Director              Chief Financial Officer and Director

SILLC  SRFI  SIIG  GVECR  PEMG  B&M

SCHEDULE 1

Baker & McKenzie, LLP Escrow Account

Baker & McKenzie, City Bank, N.A.
Private Banking Division
153 53rd Street
20th Floor
New York, N.Y. 10043

Name of Account:    Baker & McKenzie LLP Attorney Trust IOLA
Account No:         37956006
Routing No:         021000089

SILLC  SRFI  SIIG  GVECR  PEMG  B&M

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                             :

Pandora Select Partners, LP, Pandora Select    :       06 CV 0938 (KMW)
Advisors, LP, Whitebox Convertible          :       ECF CASE
Arbitrage Partners, LP, Whitebox Convertible  :
Arbitrage Advisors, LLC, Whitebox Hedged High :
Yield Partners, LP, Whitebox Hedged High Yield :
Advisors, LP, Aviator Master Fund, Ltd., Aviator :
Overseas Fund II, Ltd., Aviator Fund Management, :
L.P., JMG Triton Offshore Fund, Ltd., JMG    :
Capital Partners, LP,                    :
                             :
             Plaintiffs,       :       **COMPLAINT**
                             :
v.                          :       **JURY TRIAL**
                             :       **DEMANDED**
                             :
Strategy International Insurance Group,     :
Inc., Strategy Real Estate Investments Ltd.,   :
Stephen Stonhill, Sandro Sordi, and John Hamilton, :
                             :
            Defendants.      :
                             :
-------------------------------------------------------------x

      Plaintiffs Pandora Select Partners, LP, Pandora Select Advisors, LP, Whitebox

Convertible Arbitrage Partners, LP, Whitebox Convertible Arbitrage Advisors, LLC, Whitebox

Hedged High Yield Partners, LP, Whitebox Hedged High Yield Advisors, LP, Aviator Master

Fund, Ltd., Aviator Overseas Fund II, Ltd., Aviator Fund Management, L.P., JMG Triton

Offshore Fund, Ltd., JMG Capital Partners, LP, by their attorneys Anthony Ostlund & Baer, P.A.

and Morgenstern Jacobs & Blue, LLC, for their Complaint against defendants Strategy

International Insurance Group, Inc., and Strategy Real Estate Investments Ltd., allege:



### PRELIMINARY STATEMENT

1.      This is a case in which the defendants, using a web of misrepresentations, omissions and false promises, induced the plaintiffs into investing $50,000,000.   The investments were in Series A and Series B preferred shares of defendant Strategy Real Estate Investments, Ltd. ("SREI") and in warrants to buy common shares of defendant Strategy International Insurance Group, Inc. ("SIIG"), a publicly-held Texas corporation.   Among other things, the defendants represented and warranted that the financial statements of SIIG that had been filed with the Securities and Exchange Commission fairly presented in all material respects the financial position of SIIG and its consolidated subsidiaries.   In fact, however, the financial statements were materially misstated because nearly all of the equity recorded on SIIG's balance sheet was based upon promises by its owners to contribute capital, as opposed to actual capital invested.   The promises to contribute capital were purportedly secured by mortgages.   In fact, however, the mortgages had been released, and the purported capital was nothing more than subscriptions not properly recorded as equity, but rather as a contra account, a material difference that caused SIIG's auditors to issue a "going concern" audit opinion.   That means that there is substantial doubt about the ability of SIIG to continue as a going concern.

2.      In addition, defendants failed to disclose material negative facts about some of the defendants' principal executives and directors.   Among other things, defendants failed to disclose that Sandro Sordi was found liable in a Florida Court for fraudulent inducement, conversion of funds and violation of Florida's Securities Law and that *punitive damages* as well as compensatory were awarded against him by that jury based upon those allegations. Defendants further failed to disclose that Kevin Hamilton had filed bankruptcy in 2003.

3.      Defendant SIIG has already failed to register the common shares underlying the warrants purchased by the plaintiffs as promised, and has failed to pay to plaintiffs liquidated damages in an amount in excess of $5,000,000 for failing to register those shares as promised.

4.      Defendants projected timelines for the development of the properties that had no basis in fact.   Defendant SREI has made little progress towards the development of the properties despite projections that projects would be completed as soon as May, 2005.

5.      Although defendants have represented that approximately $32 million of the plaintiffs' investment remains in cash on hand as of December 2005, defendants have denied plaintiffs' requests for meaningful information and input about the use of plaintiffs' investment funds and despite promises to the contrary, have refused to allow plaintiffs access to the defendants' accounting personnel or auditors.

## THE PARTIES

6.      Plaintiff Pandora Select Partners, LP, is a British Virgin Islands Limited Partnership with its principal place of business in Minneapolis, Minnesota.   Pandora Select Partners, LP is the record owner of some of the investments at issue in this case.   Pandora Select Partners, LP invested $1 million in defendants.

7.      Pandora Select Advisors, LP, is a Delaware Limited Partnership with its principal place of business in Minneapolis, Minnesota.   Pandora Select Advisors, LP is the investment advisor to Pandora Select Partners, LP and on its behalf made the decision to make the investment in the defendants at issue in this case.

8.      Plaintiff Whitebox Convertible Arbitrage Partners, LP, is a British Virgin Islands Limited Partnership with its principal place of business in Minneapolis, Minnesota. Whitebox

110150.1                                          3

Convertible Arbitrage Partners, LP is the record owner of some of the investments at issue in this case. Whitebox Convertible Arbitrage Partners, LP invested $5 million in defendants

9. Whitebox Convertible Arbitrage Advisors is a Delaware Limited Liability Company with its principal place of business in Minneapolis, Minnesota. Whitebox Convertible Arbitrage Advisors, LP is the investment advisor to Whitebox Convertible Arbitrage Partners LP and on its behalf made the decision to make the investment in the defendants at issue in this case.

10. Plaintiff Whitebox Hedged High Yield Partners, LP, is a British Virgin Islands, Limited Partnership with its principal place of business in Minneapolis, Minnesota. Whitebox High Yield Partners, LP is the record owner of some of the investments at issue in this case. Whitebox High Yield Partners, LP invested $4 million in defendants.

11. Whitebox Hedged High Yield Advisors, LP is a Delaware Limited Partnership with its principal place of business in Minneapolis, Minnesota. Whitebox Hedged High Yield Advisors, LP is the investment advisor to Whitebox Hedged High Yield Partners LP and made the decision to make the investment in the defendants at issue in this case. The plaintiffs identified in paragraphs 6 through 11 collectively are referred to herein as the "Whitebox Plaintiffs".

12. Plaintiff Aviator Master Fund, Ltd. is a Cayman Islands corporation with its principal place of business in Connecticut. Aviator Master Fund, Ltd. holds $14.5 million in defendants' securities. Some of those securities originally were purchased by Aviator Overseas Fund II, Ltd., a Cayman Islands corporation, and subsequently were transferred to Aviator Master Fund, Ltd. The investment advisor to Aviator Master Fund, Ltd. and Aviator Overseas Fund II, Ltd is Aviator Fund Management, L.P., a Delaware partnership with its principal place

of business in Connecticut. The plaintiffs identified in this paragraph collectively are referred to herein as the "Aviator Plaintiffs".

13.     Plaintiff JMG Triton Offshore Fund, Ltd., is a British Virgin Islands corporation with is principal place of business in Los Angeles, California. JMG Triton Offshore Fund, Ltd is the record owner of some of the investments at issue in this case. JMG Triton Offshore Fund, Ltd invested $12.25 million in defendants.

14.     Plaintiff JMG Capital Partners, LP, is a California Limited Partnership with its principal place of business in Los Angeles, California. JMG Capital Partners, LP is the record owner of some of the investments at issue in this case. JMG Capital Partners, LP invested $12.5 million in defendants. The plaintiffs identified in paragraphs 13 and 14 collectively are referred to herein as the "JMG Plaintiffs".

15.     Defendant SIIG is incorporated under the laws of Texas with its principal place of business in the Province of Ontario, Canada. SIIG is a publicly traded holding company for a group of financial service companies that are located throughout the world. Strategy Holding Company Limited is SIIG's wholly-owned subsidiary that sits at the top of a group of insurance related organizations that include Strategy Insurance Limited of Barbados, Strategy Insurance (Canada) Limited, Strategy Underwriting Agency Limited, and SIIG's equity interest in ForestRe Holdings Ltd., ForestRe Ltd. and AgroForest Risk Management Ltd. (collectively, "ForestRe"). Strategy Holding Company Limited owns all of the insurance operations of which the key operating insurance company is Strategy Insurance Limited. Strategy Insurance Limited was incorporated in Barbados on December 23, 2003 under the Exempt Insurance Act and is an operating insurance company.

16.     Defendant SREI is incorporated under the laws of the Province of Ontario, Canada with its principal place of business in the Province of Ontario, Canada.  SREI is a wholly-owned subsidiary of SIIG, and was organized for the purpose of making investments in the development of residential real estate properties in Canada.  SREI was incorporated on August 23, 2004.

17.     Defendant Stephen Stonhill is Chief Executive Officer and Chairman of the Board of SIIG.  On information and belief Mr. Stonhill is a resident of Canada.

18.     Defendant Sandro Sordi is General Counsel, Vice President and a Director of SREI.  On information and belief Mr. Sordi is a resident of Canada.

19.     Defendant John Hamilton is CEO and a Director of SREI.  On information and belief Mr. Hamilton is a resident of Canada.  The defendants identified in paragraphs 17 through 19 collectively are referred to herein as the "Individual Defendants."

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action pursuant to pursuant to 28 U.S.C. §§1332(a) based upon complete diversity among the plaintiffs and defendants and based upon the amount in controversy which exceeds the sum of $75,000.

21.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §§1391(a) and 1391(d) because defendants have expressly consented to venue in this District in operative documents which state that: "Any controversy, claim or dispute arising out of or relating to [the Subscription Agreement] between the parties hereto, their assignees, their affiliates, their attorneys or agents, shall be litigated solely in state or federal court in New York City.  Each party (i) submits to the jurisdiction of any such court, [and] (ii) waives the defense of an inconvenient forum . . ."  Further, certain defendants are aliens.

110150.1

6

22.    In connection with the acts, transactions and conduct alleged herein, defendants directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of a national securities exchange.

## SUBSTANTIVE ALLEGATIONS

23.    In November 2004, SREI sought to raise money through a private offering pursuant to a Confidential Private Placement Memorandum (the "PPM"). The PPM represented that SREI was seeking US $50,000,000 and stated that the funds would be used to invest, through placements of short-term second mortgages, in certain special purpose resident real estate properties in Canada being developed by the Lux Group Inc., a company formed under the laws of the Province of Ontario, Canada *and under common control with SREI.* McMahan Securities Co. L.P. ("McMahan Securities") was engaged to assist in the offering as a Placement Agent.

24.    On November 16, 2004, plaintiffs purchased the entire private offering of SREI in the aggregate amount of $50,000,000 of Units, each Unit consisting of: (a) one share of Series A Insured Redeemable Preferred Stock of SREI; (b) one share of Series B Preferred Stock of SREI; and (c) a Warrant to purchase shares of common stock of SIIG. The purchase price was $10,000 per unit.

25.    The liquidation preference and the quarterly dividends for the Series A Preferred shares were purportedly insured by United Insurance Company Limited, a Barbados insurer; the Series A Preferred shares being subject to a mandatory redemption in 2007, and fixed preferred cash dividends at the rate of 10% per annum on liquidation preference.

26.    Warrants covering 29,992,202 shares of SIIG's common stock were sold as part of the sale of the Units. Each Warrant allows its holder to exercise the Warrant into a number of

shares of common stock equal to the quotient obtained by dividing (a) the liquidation preference amount of the shares of Series A Preferred Stock of SREI owned by such holder plus any accrued but unpaid dividends thereon by (b) the then applicable set price. The initial set price was $1.6671.

27.    Plaintiffs purchased the Units pursuant to a Subscription Agreement with SREI and SIIG, dated November 16, 2004. By the terms of the Subscription Agreement both SREI and SIIG made a series of representations and warranties to plaintiffs to induce their investment in SREI and SIIG. Plaintiffs relied upon these representations and warranties in purchasing the Units and thereby invested in SREI and SIIG.

28.    SREI represented and warranted, among other things, that neither the Subscription Agreement nor any other documents, certificates or instruments furnished to the plaintiffs by or on behalf of SREI in connection with the transactions contemplated by the Subscription Agreement contained any untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made therein, not misleading.

29.    SIIG represented and warranted, among other things, that the reports and exhibits it had filed with the Securities and Exchange Commission ("SEC") for the two years preceding the date of the Subscription Agreement (collectively referred to as the "SEC Reports") complied in all material respects with the requirements of the Securities Act and the Exchange Act and the rules and regulations of the SEC promulgated thereunder, and that none of the SEC Reports, when filed, contained any untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

30.     SIIG further represented and warranted that the financial statements of SIIG included in the SEC Reports were prepared in accordance with the United States generally accepted accounting principles applied on a consistent basis during the periods involved ("GAAP"), and that such financial statements fairly presented in all material respects the financial position of SIIG and its consolidated subsidiaries.

31.     SIIG further represented and warranted that since the date of the latest audited financial statements included within the SEC Reports there has been no event, occurrence or development that has had or that could reasonably be expected to result in a material adverse effect.

32.     SIIG further represented and warranted that all disclosure provided to plaintiffs regarding SIIG, its business and the transactions contemplated hereby furnished by SIIG are true and correct and do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.

33.     The SEC Reports and financial statements of SIIG that plaintiffs reviewed and relied upon in connection with their November 2004 purchase of the Units included a description of a February 2004 transaction by SIIG's wholly-owned subsidiary Strategy Holding Company Limited ("Strategy Holding").

34.     In early February 2004, as part of its initial capitalization, the PPM represented that Strategy Holding received, as consideration for the issuance of 40% of the shares of its Series A Preferred Stock and Series B Preferred Stock, mortgage notes receivable totaling $104,231,610. The notes were purportedly secured by certain mortgages on Canadian real estate

reportedly having an estimated fair market value (confirmed at the time by a valuation conducted by a real estate broker) equal to the carrying amount of the mortgage notes.

35.    The mortgages were registered on February 5, 2004 in the name of Garadan Inc. ("Garadan") and Maintop Holdings Inc. ("Maintop"), companies wholly-owned by Kavrav Ltd. Garadan and Maintop assigned the mortgages to Strategy Holding on February 5, 2004, and on the same day Strategy Holding reassigned the mortgages to SIL, another one of SIIG's subsidiaries.

36.    In its Form 10-KSB for the annual period ending April 30, 2005 (the "2004-2005 Annual Report"), filed on September 16, 2005, SIIG reported that on or about August 12, 2005, SIIG became aware that the mortgages underlying the notes receivable had been discharged in October 2004 by the beneficial owners of SIIG's Series A Preferred Stock and Series B Preferred Stock, as well as the corporate entities controlled by them, including Kavrav Ltd.

37.    Kavrav Ltd is one of the founders of SIIG.  Kavrav Ltd and Frank Ney own approximately 71.3% of SIIG's common stock and are able to determine the composition of SIIG's board of directors.  Although SIIG represented in at least one SEC filing that it intended to pursue all of its legal rights and remedies including, without limitation, litigation to recover the value of the notes receivable and appropriate damages against Kavrav, Ltd and others, upon information and belief no such action has been taken.

38.    John Hamilton, the Chief Executive Officer of SREI, has voting power of the shares owned by Kavrav, Ltd pursuant to a voting agreement with Kavrav, Ltd.  Sordi likewise has voting power of the shares owned by Frank Ney pursuant to a voting agreement.

39.     As a result of the discharge of the mortgages, the notes became unsecured.  As such, generally accepted accounting principles required that the notes receivable be reflected as contra-equity rather than as assets on SIIG's financial statements.

40.     SIIG reported the discharge of the mortgages in the audited financial statements included in its 2004-2005 Annual Report, and reclassified the notes receivable as subscriptions. Therefore, the unsecured notes receivable should have been and now are reflected in SIIG's audited financial statements as a contra-equity account.

41.     In its 2004-2005 Annual Report, SIIG further disclosed that its auditors have issued a "going concern" qualification as part of their opinion in the audit.  This means that there was substantial doubt about the ability of SIIG to continue as a "going concern."

42.     Because the mortgages were discharged in **October 2004**, prior to the date of the PPM provide to plaintiffs by SIIG and SREI and prior to plaintiffs' purchase of the Units, the representations and warranties contained in the November 16, 2004 Subscription Agreement concerning SIIG's financial statements, balance sheets, and SEC Reports were false and materially misleading when made as SIIG and SREI failed to disclose, in any manner, the discharge of the mortgages and the materially adverse financial consequences to SIIG and SREI resulting from the discharge.

43.     The PPM and the defendants further failed to disclose material facts about certain principal executives.  Among other things, the PPM failed to disclose that Sandro Sordi, the General Counsel, Vice President and a Director of SREI ("Sordi"), and John Hamilton, the Chief Executive Officer and a Director of SREI had been named defendants in a $20 million lawsuit by Maple Palm Production, Inc. which alleged "scandalous" conduct, including fraudulent and negligent misrepresentation.

44.     The PPM and the defendants further failed to disclose that since February 4, 2003, Sordi has not been eligible to practice law in the State of Florida; indeed, the PPM states that he continues to maintain a small private legal practice.

45.     The PPM and the defendants further failed to disclose that on April 24, 1996, a contract indebtedness suit had been brought against Sordi and another individual in Broward County, Florida.  On February 28, 2002, a jury verdict was rendered against Sordi and the other individual in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida. The jury found that there were damages for fraudulent inducement by Sordi and the other individual and conversion of funds.  The jury also found that there had been a violation of Florida's Securities Law, Chapter 517.  The jury also found that the circumstances warranted punitive damages against Sordi; it was adjudged that McDowell recover $611,000 from Sordi and the other individual, jointly and severally, and that he further recover $100,000 in punitive damages against Sordi.  The order was entered at Fort Lauderdale, Broward County, Florida on March 5, 2002.

46.     The PPM and the defendants further represented that Lux Group Inc. ("Lux"), the primary real estate developer for the projects in which SREI was investing, was managed by an experienced management team including as its Chief Executive Officer, Kevin Hamilton, the brother of John Hamilton (Chief Executive Officer and Director of SREI).   The PPM described Kevin Hamilton in glowing terms, and represented that he "had a wealth of business insight, financial management and industry experience."  The defendants failed, however, to disclose a 2003 bankruptcy filing in Canada by Mr. Hamilton.  He reported his total liabilities at the time as CND$936,000; he did not report his total assets.

47.     John Hamilton and Sordi directly and indirectly beneficially own approximately 32% of Lux.

48.     The PPM and the defendants further misrepresented the true status of the development process for the Canadian real estate and/or made projections which had no basis in fact. In the PPM, defendants represented that:

49.     Construction of the 11 Christie Street property began in September 2004, and completion of construction was expected in May, 2005. As of December 19, 2005, the scheduled completion of the property was 15 months later; August, 2006. As of December, 2005, the only visible signs of progress at the site are the existence of concrete footings.

50.     Completion of construction on 40 Westmoreland (Toronto, Canada) was planned for October, 2005. As of December 19, 2005, the site plan had not yet been approved and construction drawings were only 85% complete. As of December 19, 2005, construction had not yet started, but was anticipated to start only in February 2006.

51.     Construction for each of the projects was anticipated to be 14-16 months, with the exception of Elevator Bay, which would take approximately 36 – 42 months.

52.     The PPM's  projections relating to the development timeline were without basis in fact.

53.     The defendants acted with scienter. Among other things, they knew that the financial statements of SIIG were materially misstated, and that rather than the robust equity reported to the SEC, defendant SIIG had a significant negative equity, and that there was substantial doubt as to whether SIIG could continue as a going concern. In addition, defendants knew about the negative history related to Sandro Sordi as alleged above, knew that such negative history was material, that plaintiffs would not have invested $50,000,000 in defendants

if they knew of those material misstatements and omissions, and failed to disclose that negative history with the intention that plaintiffs would act without knowledge of Sordi's history.

54.    Plaintiffs invested $50,000,000 on the basis of and in reliance upon the above-referenced representations and without knowledge of the omitted material facts.

55.    Plaintiffs have been damaged in an amount in excess of $50,000,000.

56.    In connection with plaintiffs' purchase of the Units, plaintiffs and SIIG also entered into a Registration Rights Agreement, dated November 16, 2004.

57.    SIIG is obligated, pursuant to the Registration Rights Agreement, to register for resale the shares of common stock issuable upon exercise of the Warrants purchased by the plaintiffs.

58.    Under the Registration Rights Agreement, plaintiffs are entitled to liquidated damages if SIIG fails to file a Registration Statement and it is not declared effective by the SEC within an allotted period of time.

59.    Because no Registration Statement has been declared effective within the time period set forth in the Registration Rights Agreement, SIIG owes plaintiffs liquidated damages pursuant the Registration Rights Agreement.

60.    SIIG's system of disclosure controls and procedures, at least as of September, 2005, was not effective because of a lack of inadequate numbers of internal personnel possessing the appropriate knowledge, experience and training in applying generally accepted accounting principals and in SEC reporting requirements.  Upon information and belief, that ineffectiveness has not been adequately remedied, and there is significant risk that the assets of SIIG and its subsidiaries are being or could be misappropriated or wasted, especially in light of the facts alleged herein.

110150.1                                    14

61.    The Individual Defendants, through their managerial authority, ownership interests in SIIG and affiliates doing business with SIIG and SREI, through their knowledge of misinformation and omissions contained in the PPM, were controlling persons of SREI and SIIG.

## FIRST CAUSE OF ACTION:

### FOR BREACH OF CONTRACT/WARRANTY – SUBSCRIPTION AGREEMENT

62.    Paragraphs 1 to 61 of the Complaint are incorporated as if stated fully herein.

63.    In the Subscription Agreement, SIIG and SREI made a series of representations and warranties, as more fully described above, concerning the financial statements, balance sheets, SEC Reports, and other financial information and documents provided to the plaintiffs in connection with plaintiffs' purchase of the Units.

64.    SIIG and SREI breached their representations and warranties set forth in the Subscription Agreement and described above.  The representations and warranties contained in the Subscription Agreement were false and materially misleading when made as SIIG and SREI failed to disclose, in any manner, the discharge of the mortgages and the materially adverse financial consequences to SIIG and SREI resulting from the discharge.

65.    As a direct and proximate result of SIIG's and SREI's breach of warranties and representations, plaintiffs have suffered damages greater than $50,000,000, the exact amount to be proven at trial.

## SECOND CAUSE OF ACTION:

### FOR BREACH OF CONTRACT – REGISTRATION RIGHTS AGREEMENT

66.    Paragraphs 1 to 65 of the Complaint are incorporated as if stated fully herein.

67.    Plaintiffs and SIIG also entered into a contract, the Registration Rights Agreement, in connection with plaintiffs' purchase of the Units.

68.    SIIG has breached the Registration Rights Agreement because it has failed to file a Registration Statement to register for resale the shares of common stock issuable upon exercise of the Warrants purchased by the plaintiffs which has been declared effective by the SEC within the period of time set forth in the Registration Rights Agreement.

69.    As a direct and proximate result of SIIG's breach of the Registration Rights Agreement, SIIG owes plaintiffs liquidated damages pursuant the Registration Rights Agreement in an amount greater than $1 million, the exact amount to be proven at trial.

### THIRD CAUSE OF ACTION:

### FOR FRAUD

70.    Paragraphs 1 to 65 of the Complaint are incorporated as if stated fully herein.

71.    The representations made by SIIG and SREI, as described above, concerned material existing facts.

72.    SIIG and SREI made the representations knowing they were false, or with a reckless disregard of the truth or falsity of the representations.

73.    Plaintiffs were unaware that the representations made by SIIG and SREI were not true.

74.    SIIG and SREI made the representations to plaintiffs with the intention that plaintiffs rely upon the representations.

75.    Plaintiffs relied and acted upon the representations made by SIIG and SREI when plaintiffs purchased the Units.

76.    As a direct and proximate result of SIIG's and SREI's fraudulent representations, plaintiffs have suffered damages greater than $50 million, the exact amount to be proven at trial.

## FOURTH CAUSE OF ACTION:

### FOR MINNESOTA SECURITIES FRAUD
### MINN. STAT. §§ 80A.01 AND 80A.23

### (THE WHITEBOX PLAINTIFFS)

77.    Paragraphs 1 to 65 and 70 to 76 of the Complaint are incorporated as if stated fully herein.

78.    As more fully described above, defendants, in connection with the sale of securities, employed devices, schemes or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices or a course of business which operated as a fraud and deceit upon the Whitebox Plaintiffs as purchasers of securities, all in violation of Minn. Stat. §§ 80A.01 and 80A.23, subd. 2.

79.    Defendants directed their offer to sell securities, including the preferred shares of SREI and the warrants of SIIG, to Minnesota and their offer was received by the Whitebox Plaintiffs in Minnesota.

80.    The Whitebox Plaintiffs justifiably relied on the above-stated misrepresentations and acted without knowledge of the above-stated omissions.

81.    As a direct and proximate result of the aforesaid misconduct, the Whitebox Plaintiffs sustained damages in excess of $1 million in connection with the purchase of the securities, including the preferred shares of SREI and the warrants of SIIG, and are therefore entitled to recover damages from defendants, or alternatively, rescind the transaction and receive

all capital previously contributed, together with interest, reasonable attorneys' fees and such further relief as may be just.

82.     The Whitebox Plaintiffs are also entitled to all relief described in paragraph 81 against the Individual Defendants who have controlling person liability pursuant to Minn. Stat. §80A.23 subd. 3.

### FIFTH CAUSE OF ACTION:

### FOR CALIFORNIA SECURITIES FRAUD
### CAL. CORP. CODE §§ 24501, 25501

### (THE JMG PLAINTIFFS)

83.     Paragraphs 1 to 65 and 70 to 76 of the Complaint are incorporated as if stated fully herein.

84.     As more fully described above, defendants, offered to sell and sold securities, including the preferred shares of SREI and the warrants of SIIG, in California to the JMG Plaintiffs by means of written or oral communications which included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

85.     The JMG Plaintiffs did not know that statements of material fact made defendants were untrue or that the material facts omitted by defendants made defendants' other statements misleading.

86.     Defendants' conduct as described in this Complaint is in violation of section 25401 of the California Corporation Code.

87.     As a direct and proximate result of the aforesaid misconduct, The JMG Plaintiffs sustained damages in excess of $1 million in connection with the purchase of the securities, including the preferred shares of SREI and the warrants of SIIG, and are therefore entitled to

110150.1

recover damages from defendants, or alternatively, rescind the transaction and receive all capital previously contributed, together with interest, reasonable attorneys' fees and such further relief as may be just.

88.    The JMG Plaintiffs are also entitled to all relief described in paragraph 94 against the Individual Defendants who have controlling person liability pursuant to Cal. Corp. Code. §25504.

## SIXTH CAUSE OF ACTION:

### FOR TEXAS SECURITIES FRAUD
### TEXAS CIV. ST. ART. 581-33

89.    Paragraphs 1 to 65 and 70 to 76 of the Complaint are incorporated as if stated fully herein.

90.    Defendants originated the sales of securities, including the preferred shares of SREI and the warrants of SIIG, to plaintiffs from the State of Texas.

91.    As more fully described above, defendants, offered to sell and sold securities, including the preferred shares of SREI and the warrants of SIIG, to plaintiffs by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

92.    Defendants violated Texas Civ. St. Art. 581-33 with respect to the sales of securities, including the preferred shares of SREI and the warrants of SIIG, to plaintiffs.

93.    As a direct and proximate result of the aforesaid misconduct, plaintiffs sustained damages in excess of $50 million in connection with the purchase of the securities, including the preferred shares of SREI and the warrants of SIIG, and are therefore entitled to recover damages from defendants, or alternatively, rescind the transaction and receive all capital previously

contributed, together with interest, reasonable attorneys' fees and such further relief as may be just.

94.     Plaintiffs are also entitled to all relief described in paragraph 100 against the Individual Defendants who have controlling person liability pursuant to Tex. Civ. St. Art. 581-33F.

## DEMAND FOR JURY TRIAL

95.     Plaintiffs hereby demand a trial by jury as to all issues so triable.

WHEREFORE, plaintiffs request an Order and Judgment from the Court as follows:

96.    Awarding damages greater than $50,000,000 in favor of plaintiffs, the precise amount to be proven at trial, and against defendants, jointly and severally.

97.    Appointing a Receiver with authority to oversee and direct the financial affairs of SIIG, SREI and their related entities.

98.    Awarding plaintiffs interest, costs and reasonable attorneys fees; and

99.    Granting such further and other relief, including, specifically, equitable relief, as the Court deems just.

Dated: February 6, 2006


MORGENSTERN JACOBS & BLUE, LLC

By:    /s/ Gregory A. Blue
       Gregory A. Blue (GB-9569)
       Rachel K. Marcoccia (RM-4823)
       885 Third Avenue
       New York, NY 10022
       Telephone: (212) 750-6776
       Facsimile: (212) 750-3128

                   -And-

ANTHONY, OSTLUND & BAER, P.A.

       Jeffrey I. Ross
       Vincent D. Louwagie
       90 S. 7th St., Ste. 3600
       Minneapolis, MN  55402
       Telephone: (612) 349-6969
       Facsimile: (612) 349-6996

*ATTORNEYS FOR PLAINTIFFS*